709 A.2d 350

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Vincent Francis CASS, Appellee.**

Supreme Court of Pennsylvania.

Argued Sept. 18, 1996.

Decided Jan. 7, 1998.

Joseph P. Conti, Christian A. Trabold, Erie, for Com.

James Pitonyak, Erie, for Vincent Cass.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

### OPINION ANNOUNCING THE JUDGMENT OF THE COURT

CAPPY, Justice.

This case presents the question of what level of protection public school students are entitled to during a school wide search under the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution.[1] For the reasons that follow we find that public school students have a limited expectation of privacy while in the school environment. In balancing this limited privacy interest against the need to maintain a safe and secure environment for all public school students, we find that public school students are subject to a search by school officials when the decision to search is reasonable given all the circumstances present at the inception of the search and the search itself is reasonably limited in its scope to the objective which initially prompted the search. Applying this principle, we reverse the decision of the Superior Court.

The actions which prompted this appeal occurred on April 12, 1994 at the Harborcreek High School in Harborcreek Township, Erie County, Pennsylvania. The school principal announced to the students that morning that a safety inspection would be conducted. The students were to remain in

1. The Fourth Amendment of the United States Constitution reads as follows:

*Amendment IV*

"The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized."

The text of Article 1, Section 8 of the Pennsylvania Constitution provides as follows:

*Security from Searches and Seizures*

Section 8. The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

their classes until the inspection was completed. The inspection was in actuality a search of all the student lockers, 2,000 in number, for the presence of drugs and/or drug paraphernalia. In order to expedite the search process, the principal enlisted the aid of two police officers and a trained drug dog. The methodology for the search was that the Erie police officer who was designated as the dog handler would take the dog to each locker in the school accompanied by school officials. When the dog "alerted" to a particular locker, the other officer, along with school officials, would open that locker, and any lockers adjacent thereto, and search the contents. Based upon the alerts by the dog, a total of 18 lockers were searched during the inspection. Appellee's locker was the only one of the 18 lockers searched which was found to contain contraband. The search of appellee's locker resulted in the seizure of a small amount of marijuana, a pipe, a roach clip and rolling papers. Appellee was subject to a ten-day out of school suspension and required to attend counseling. In addition, appellee was charged criminally with possession of a small amount of marijuana and possession of drug paraphernalia.[2] In connection with the criminal charges, appellee filed a motion to suppress the items seized from his locker during the safety inspection. Appellee claimed in the motion to suppress that the search and seizure violated his rights under both the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution.

The trial court held a hearing on the motion to suppress on October 4, 1994. At the suppression hearing the school principal testified that the search was undertaken due to concerns which had arisen over the preceding months indicating that drugs were being sold within the school. The principal offered several reasons for his heightened concern as to drug activity within the school: information received from unnamed students; observations from teachers of suspicious activity by the students, such as passing small packages between themselves in the hallways; increased use of the student assistance

2. Appellee was charged as an adult as he was eighteen years of age at the time of the search.

program for counseling students with drug problems; calls from concerned parents; observation of a growing number of students carrying beepers; students in possession of large amounts of money; and increased use of pay phones by students. The principal also testified that he had observed students exhibiting physical signs of drug use such as dilated pupils while in the school nurse's office. Armed with this information the principal decided upon the course of conduct described above as the most efficient method of searching the 2,000 lockers in the school. The principal testified that he had not received any specific information implicating appellee as being involved in drug activity. The parties all agree that the search, as undertaken, was a general search as opposed to a particularized search which would have focused on a certain student or, in this case, a certain locker. The principal also offered in support of his decision to undertake this generalized search the Harborcreek school code which provides as follows:

> School authorities may search a student's locker and seize any illegal materials. Prior to a locker search a student shall be notified and given an opportunity to be present. However, where school authorities have a reasonable suspicion that the locker contains materials which pose a threat to the health, welfare, and safety of students in the school, students' lockers may be searched without prior warning. (*See* Reproduced Record at p. 142a).[3]

Appellee's home room teacher testified that copies of the Harborcreek school code were given to each student at the beginning of each school year. Students were instructed to read the code and have the book signed by themselves and their parents with the signature sheet returned to their homeroom teacher. On March 1, 1994, six weeks prior to the search at issue, this procedure of distribution of the school code was repeated in each homeroom.[4]

3. The Reproduced Record will hereinafter be referred to by the initials R.R., referencing pages in the reproduced record as filed with this court by appellant on May 29, 1996.

4. The record reflects that appellee had complied with this procedure in previous years and returned the required notice indicating that he and his parents had received and reviewed the school code. (R.R. 100a).

Upon considering all the evidence presented by the Commonwealth, the trial court granted the motion to suppress. The trial court held that probable cause was not required before school officials could conduct a search of a student's locker and that a search of a student locker would be valid upon a showing of reasonable suspicion. Applying the reasonable suspicion standard to the facts in this case, the trial court concluded that the search at issue did not meet the necessary legal standard. Although the trial court recognized the good intentions of the principal in his attempt to address the real problem of drug use menacing public school students, the court concluded that "good intentions" alone could not justify the sweeping search which was undertaken here in the absence of some level of articulable suspicion. The court found the principal's generalized suspicions to fall short of an objective reasonable belief that would justify the search. The Superior Court affirmed the decision of the trial court. This court granted the Commonwealth's Petition for Allowance of Appeal, and for the reasons that follow, now reverse.

The instant case requires this court to decide what degree of scrutiny is appropriate when reviewing a constitutional challenge to a search conducted by public school officials on school property.[5] As the questions presented in this appeal require an analysis of the constitutionality of this locker search under both the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution, we begin our analysis with the Fourth Amendment, as it sets the minimum level of protection from unreasonable searches and seizures below which the states may not fall. *Commonwealth v. Sell,* 504 Pa. 46, 470 A.2d 457 (1983).

The United States Supreme Court has issued two decisions addressing the constitutionality of searches conducted by public school officials within the school environment: *New Jersey*

5. Although the Harborcreek High School principal enlisted the aid of two police officers in conducting the search herein, we agree with the factual finding of the trial court that this search was undertaken by the school officials.

*v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), and, *Vernonia School District 47J v. Acton*, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). Briefly summarized, *T.L.O.* established the principle that the constitutionality of school searches would be determined upon a finding of reasonable suspicion rather than the stricter legal requirement of probable cause; *Acton* held that a school policy of random drug testing for students voluntarily engaged in school athletics did not violate the Fourth Amendment prohibition against unreasonable searches.

In *T.L.O.* a teacher discovered a freshman high school student smoking in the rest room in violation of a rule prohibiting smoking on school premises. The teacher escorted the student to the principal's office. Upon questioning by the vice-principal the student denied that she had been smoking and claimed that she did not smoke at all. The vice-principal demanded to see her purse, opened the purse, found a pack of cigarettes, and upon removing the cigarettes noticed a pack of rolling papers. The vice-principal, knowing that rolling papers were often used in conjunction with marijuana, searched further in the purse and discovered a small amount of marijuana, a pipe, empty baggies, a large quantity of money in small bills, an index card listing the names of other students who owed money to this student and two letters implicating the student in the sale of drugs. The student was subsequently brought before the Juvenile Court on charges arising from this incident. The Juvenile Court denied the motion to suppress the evidence, finding that the vice-principal had reasonable suspicion to believe that a violation had occurred and that the search was necessary to maintain school discipline. The New Jersey Supreme Court reversed holding that the search of the purse was not reasonable. The United States Supreme Court granted certiorari and reversed.

The Court in *T.L.O.* held that the Fourth Amendment does apply to searches of public school students by school officials, *Id.*, 469 U.S. at 333, 105 S.Ct. at 738; that the students do have a legitimate expectation of privacy regarding their personal effects while in school, *Id.* at 339, 105 S.Ct. at 741; that school officials have a substantial interest in maintaining disci-

pline in the classroom and on school grounds, *Id.* at 339, 105 S.Ct. at 741; and that this interest requires a certain degree of flexibility regarding the interplay between student rights and administrators' need to provide a safe and secure learning environment. *Id.* at 340–41, 105 S.Ct. at 742. In order to satisfy these equally compelling concerns, the Court crafted a balance which would effectuate the privacy rights of the students and permit searches by the school officials without offending the Fourth Amendment. To that end the Court held:

> We join the majority of courts that have examined this issue in concluding that the accommodation of the privacy interests of schoolchildren with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause to believe that the subject of the search has violated or is violating the law. Rather, the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search. Determining the reasonableness of any search involves a twofold inquiry: first, one must consider 'whether the ... action was justified at its inception,' *Terry v. Ohio,* 392 US, [1] at 20 [88 S.Ct. 1868, 20 L.Ed.2d 889 at 1879 (1968)], second, one must determine whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place,' *ibid.* Under ordinary circumstances, a search of a student by a teacher or other school official will be 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school. Such a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction.

*Id.* at 341–42, 105 S.Ct. at 742–43 [footnotes omitted].

■ *T.L.O.,* thus, establishes that students do possess a legitimate, yet limited, expectation of privacy within the school

environment. Given the particular problems which arise within a school environment and the need of school officials to immediately address those problems, the *T.L.O.* Court found that probable cause was too high a standard to require in school search situations; thus, the reasonable suspicion standard was deemed sufficient to satisfy the constitutional interests of the students. Applying these principles to the search in *T.L.O.*, the Court held that the search was justified at its inception by reasonable suspicion that the student was in violation of a school rule and that evidence of that violation could reasonably be found within her purse. Furthermore, the search itself was reasonably limited in its scope, given the nature of the conduct at issue.

In *Acton*, the United States Supreme Court faced a different constitutional challenge to the rights of public school students under the Fourth Amendment. The Court was presented with a challenge to the school district's policy requiring all student athletes to submit to random urinalysis drug testing. The school district had adopted the policy in response to an increase in school disciplinary problems which school officials concluded were directly related to an increase in drug use in the student population. 515 U.S. at 647, 115 S.Ct. at 2388. The school district in investigating the problems created by increased student drug use discovered that the student athletes were highly involved in the school's drug culture, and in fact took a leading role in such illicit activity. *Id.* at 647-49, 115 S.Ct. at 2388-89. To combat the drug problem, a policy was created subjecting all interscholastic athletes, with the written consent of their parents, to random weekly drug testing by urinalysis. *Id.* at 650, 115 S.Ct. at 2389.

Reviewing the drug testing policy in light of the students' Fourth Amendment right to be free from unreasonable searches, the *Acton* Court began its analysis by examining its prior decision in *T.L.O.*, which held that searches of school students by school officials need not meet the stringent requirements of probable cause to pass constitutional muster. *T.L.O.* made it clear that such searches would be upheld under

the Fourth Amendment upon a showing of reasonable suspicion. *T.L.O.*, at 341–42, 105 S.Ct. at 742–43. However, the *Acton* Court recognized the difficulty in applying the holding of *T.L.O.* to the random drug testing at issue in *Acton*, since the searches performed there were undertaken in the absence of individualized suspicion of wrongdoing. *Acton*, at 653, 115 S.Ct. at 2391. The *Acton* Court thus looked to the rationale developed in cases involving searches of a generalized non-suspicious nature: *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) (roadblocks for drunk drivers, constitutional); *National Treasury Employees v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (random drug testing of federal customs officers, constitutional); *Skinner v. Railway Labor Executives' Association*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (suspicionless drug testing of railroad employees involved in train accidents, constitutional); and *United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (automobile checkpoints looking for illegal immigrants and contraband, constitutional). The difference in focus of a Fourth Amendment "reasonableness" inquiry, where the search is a general, as opposed to an individual search, was best stated by the Court in *Skinner*:

Our cases indicate that even a search that may be performed without a warrant must be based, as a general matter, on probable cause to believe that the person to be searched has violated the law. *See New Jersey v. T.L.O.*, supra. [469 U.S.] at 340 [105 S.Ct. at 742]. When the balance of interests precludes insistence on a showing of probable cause, we have usually required "some quantum of individualized reasonable suspicion" before concluding that a search is reasonable. *See, e.g., United States v. Martinez–Fuerte*, 428 U.S. at 560 [96 S.Ct. at 3084]. We made it clear, however, that a showing of individualized reasonable suspicion is not a constitutional floor, below which a search must be presumed unreasonable. *Id.*, [428 U.S.] at 561 [96 S.Ct. at 3084]. In limited circumstances, where the privacy interests implicated by the search are minimal, and where

an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion.

*Skinner*, 489 U.S. at 624, 109 S.Ct. at 1417.

Thus, the reasonableness inquiry in a general, or random, search is not focused on the particular circumstances leading to the decision to search *this* person, place or thing. Rather, the inquiry focuses on whether the search itself is reasonable considering the governmental interest in conducting the search when balanced against the level of intrusion occasioned by the search. From these general search cases the *Acton* Court extracted three primary factors to be examined when addressing the constitutionality of random searches, and applied them to the unique setting of the school environment. The three factors the *Acton* Court focused upon were: 1) the nature of the privacy interest upon which the search at issue intrudes, *id.* at 653–54, 115 S.Ct. at 2391; 2) the character of the intrusion, *id.* at 657–58, 115 S.Ct. at 2393; and 3) the nature and immediacy of the government concern and the efficacy of the means utilized to address that concern. *id.* at 660, 115 S.Ct. at 2394.

In addressing these factors, the Court found that public school students have a lessened expectation of privacy within the school environment and that student athletes in particular have even lower expectations of privacy than other students. The Court further noted that school athletes were voluntarily involved in extracurricular athletic endeavors. *Id.* at 655–57, 115 S.Ct. at 2392. The Court then considered the manner in which the samples for testing were obtained in *Acton*, and how the students were chosen for testing. The Court found that great consideration was given to the privacy of the students subject to the testing and that the results were strictly confidential and were not released to law enforcement nor used for disciplinary purposes. The fact that students who were on medication were required to reveal that fact prior to testing was found to be a minimal intrusion. *Id.* at 659–61, 115 S.Ct. at 2394. The Court then turned to the nature and

immediacy of the governmental concern. *Id.* at 661, 115 S.Ct. at 2394. The Court found "it can hardly be doubted" that deterring drug use by school students is important "indeed perhaps compelling." *Id.* at 661, 115 S.Ct. at 2395. The Court concluded that the means used to address this concern, while not the least intrusive possible, were still minimally intrusive given the practical difficulties in any other suggested approaches.

Accordingly, the *Acton* Court held: "Taking into account all the factors we have considered above—the decreased expectation of privacy, the relative unobtrusiveness of the search, and the severity of the need met by the search—we conclude Vernonia's Policy is reasonable and hence constitutional." *Id.* at 664–65, 115 S.Ct. at 2396.

■ Considering the constitutionality of the search undertaken at the Harborcreek High School on April 12, 1994 under the Fourth Amendment, we find, as did the *Acton* Court, that the holding of *T.L.O.* provides limited guidance. Since the Harborcreek search was a general search of the entire school, our Fourth Amendment analysis must focus not on individualized reasonable suspicion of appellee, but rather, on whether the school district's decision to conduct the search was reasonable. The school district's decision to conduct a general search will be deemed reasonable under the Fourth Amendment if the decision to search was motivated by an interest of the school district, the importance of which, outweighed the intrusion into the privacy rights of the students suffered as a result of the search.

■ Following the framework established in *Acton*, we begin by considering the nature of the privacy interest upon which the search at the Harborcreek High School arguably intrudes. 515 U.S. at 653–55, 115 S.Ct.at 2391. Under the policy of the Harborcreek School District as set forth in its Code of Student Conduct, students are forewarned that their lockers are subject to a search by school officials without prior warning to the students "where school authorities have a reasonable suspicion that the locker contains materials which pose a threat to the health, welfare and safety of students in

the school." (Code of Student Conduct—1994, R.R. at 142a). The principal of Harborcreek High School testified that the lockers were the property of the school. (R.R. 92a). Although the students are permitted to use combination locks on the lockers assigned by the school for their personal use, the combinations must be filed in the school office. (R.R. 93a). The school officials also possess a master key that can open all combination locks. (R.R. 93a). School officials are constantly in the student lockers to make general repairs as needed, without first giving notice to the students. (R.R. 95a–97a). The principal also testified that although he believed the school officials could go in the student lockers at any time, they would not do so without a reason. (R.R. 106a). Based upon all of the above testimony, we conclude that, although the students of Harborcreek High School do possess a legitimate expectation of privacy in their assigned lockers, that privacy expectation is minimal.

 Given the limited privacy interest at issue, we now turn to the character of the intrusion. The search procedure employed by the Harborcreek School District on April 12, 1994 was a general search of all 2,000 school lockers. (R.R. 90a). The principal enlisted the aid of law enforcement officials in order to expedite such a vast search. (R.R. 90a). A drug sniff dog was brought to the school to sniff each locker. (R.R. 91a). Case law makes clear that a canine sniff is not a search under the Fourth Amendment.[6] When the dog alerted to a locker, that locker and those adjacent to it were opened and the contents searched.[7] (R.R. 125a). There is little doubt

6. In *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) the Court held that a canine sniff is not a search within the meaning of the Fourth Amendment. In that case, law enforcement officials detained a suspected drug dealer's suitcase in order to expose the luggage to a canine sniff. The sniff was positive and a warrant was subsequently obtained to open the suitcase. The Court rejected the argument that the sniff itself was a search, thus requiring an initial finding of probable cause. The Court classified the sniff as an investigative procedure which is unobtrusive in the manner in which it is conducted and also limited in the content of the information revealed.

7. The record is not clear as to the actual number of lockers the dog alerted to, but all the witnesses agree that a total of 18 lockers were searched.

that the intrusion into the 18 specific lockers constitutes a search within the meaning of the Fourth Amendment. However, as we have already acknowledged, students possess a limited expectation of privacy in their school lockers. Given the limited expectation of privacy in that unique setting, we conclude that a search of the lockers was a minimally intrusive invasion of the students privacy interest.

Finally, we turn to the more difficult task of balancing the competing policy concerns as required in the third factor of the *Acton* test. We must decide if the nature and immediacy of the concern at issue here justified the means utilized for meeting those concerns. In light of the circumstances in the present case, we conclude that they did. The impetus for the search was a heightened awareness of drug activity permeating throughout the entire school population, which appeared to be escalating as the school year continued. This awareness was brought on by the increased number of students seeking school sponsored counseling for drug related problems, concerned phone calls from parents, anonymous student tips regarding drug use, observations by various school personnel of students passing small packages amongst themselves in the hallways, students carrying large sums of money, students in the school displaying physical signs of drug use, students carrying beepers and an increased use of pay phones by the students. (R.R. 84a–87a). Under such circumstances, the principal had ample cause to be concerned about probable drug use by students. There can be no dispute that deterring drug use within the public schools is an important and even a compelling concern for school officials, parents, the public at large, and the students themselves.

The focus now turns to the means employed by the Harborcreek School District to address this problem. When the United States Supreme Court examined this part of the equation in *Acton,* it focused on the specifics of the problem and the practicality of the solution. In the present case, the Harborcreek principal was faced with generic but substantial evidence of increased drug use affecting the entire high school population. The indicia of drug use was exhibited in such a

fashion that it was reasonable for the principal to conclude that evidence of drug use could likely be found among the students' paraphernalia commonly brought to school and normally kept within their lockers. Given the need to maintain a school environment free of illegal drug use, the decision to search the entire school would reasonably serve two purposes: to discover actual evidence of drugs within the school, and to warn the entire student body that bringing and storing drugs within the school would not be tolerated. Since the principal suspected the evidence of drug use to be school-wide rather than limited to a certain group of students, the decision to implement a school-wide search was reasonable. Having then chosen to undertake a school-wide search the decision to utilize drug dogs to sniff the exterior of the student lockers was likewise reasonable. By using these highly trained dogs, the principal was able to further minimize the nature of the intrusion. Only a few of the 2,000 lockers were actually opened. At the same time, the principal was able to meet the compelling necessity of addressing the serious dangers caused when drugs invade the public school environment.

Based on the holding of *Acton,* we conclude that the search at Harborcreek High School, as conducted, was a practical means to effectuate the principal's compelling concerns over possible drug use, that it was minimally intrusive as it affected a limited privacy interest of the students, and thus, it was compatible with the Fourth Amendment. Accordingly, we hold that the trial court erred in granting the motion to suppress under the Fourth Amendment.

Appellee had also challenged the locker search under the provisions of the Constitution of this Commonwealth; thus, we will continue our analysis of the search at issue in accordance with the requirements of the Pennsylvania Constitution, Article I, Section 8. Before turning to a discussion of the Pennsylvania Constitution, we reiterate that the federal constitution sets the minimum level of constitutional protection below which the states cannot fall. *Commonwealth v. Sell,* 504 Pa. 46, 63, 470 A.2d 457, 466 (1983). The minimum level of protection from searches thus afforded to public school stu-

dents under the Fourth Amendment, is that set forth in the United States Supreme Court decisions of *T.L.O.* and *Acton.* We must now decide if Article 1, Section 8 of the Pennsylvania Constitution provides equivalent or greater protection to public school students than that set forth in *T.L.O.* and *Acton.*

The decision of the United States Supreme Court in *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) requires that we make a "plain statement" of the adequate and independent state grounds upon which we rely, to avoid any doubt that we have rested our decision solidly upon Pennsylvania law. To that end we developed in *Commonwealth v. Edmunds,* 526 Pa. 374, 586 A.2d 887 (1991), a four pronged methodology that we will follow in addressing the applicability of *T.L.O.* and *Acton* to the constitutionality of school searches in Pennsylvania:

1) text of the Pennsylvania constitutional provision;

2) history of the provision, including Pennsylvania case-law;

3) related case-law from other states;

4) policy considerations, including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence.

*Edmunds,* 526 Pa. at 390–91, 586 A.2d at 895.

As we acknowledged in *Edmunds,* the text of Article I, Section 8 is similar in language to the Fourth Amendment, as both provisions guarantee protection from "unreasonable searches and seizures." 526 Pa. at 391, 586 A.2d at 895. (See footnote 1 supra.) Thus, it is not the text itself which imbues Pennsylvania jurisprudence with its unique character but, rather, the history of our case law as it has developed in the area of search and seizure.

It is undeniable that the notion of privacy implicit in Article I, Section 8 is particularly strong in this Commonwealth. For the past three decades, this court has made the importance of that right explicit. After an exhaustive examination of the historical treatment of search and seizure questions by the Pennsylvania courts, we concluded in *Edmunds* itself that:

[A] steady line of case-law has evolved under the Pennsylvania Constitution, making clear that Article I, Section 8 is unshakably linked to a right of privacy in this Commonwealth. *See, Commonwealth v. Platou,* [455 Pa. 258, 312 A.2d 29] (1973); *Commonwealth v. DeJohn,* [486 Pa. 32, 403 A.2d 1283] (1979); *Commonwealth v. Sell,* [504 Pa. 46, 470 A.2d 457] (1983); *Commonwealth v. Miller,* [513 Pa. 118, 518 A.2d 1187] (1986); *Commonwealth v. Blystone,* [519 Pa. 450, 549 A.2d 81] (1988); and *Commonwealth v. Melilli,* [521 Pa. 405, 555 A.2d 1254] (1989).

526 Pa. at 397, 586 A.2d at 898. Nevertheless, this court has never considered the relatively novel question presented in this case; namely, the degree of privacy to be afforded public school students under the heightened guarantees of Article I, Section 8.[8] In *Commonwealth v. Brundidge,* 533 Pa. 167, 173, 620 A.2d 1115, 1118 (1993), this court held "[t]he constitutional legitimacy of an expectation of privacy is not dependent on the subjective intent of the individual asserting the right but on

---

**8.** The Superior Court considered this question in *In Interest of Dumas,* 357 Pa.Super. 294, 515 A.2d 984 (1986). Dumas, a high school student, was observed by a teacher getting a pack of cigarettes from his locker and giving a cigarette to another student. The teacher notified the assistant principal, who approached both students. He recovered the first cigarette from one student and then the pack of cigarettes from Dumas. The assistant principal then searched Dumas' locker and in his jacket pocket recovered another cigarette pack which contained marijuana. The assistant principal testified that he suspected that Dumas was involved in drugs, but he could articulate no specific information which supported his suspicion. A delinquency petition was filed charging Dumas with possession of marijuana. Dumas' motion to suppress the evidence as the fruit of an illegal search was granted. On appeal by the Commonwealth, the Superior Court affirmed.

The court first considered whether a student has a legitimate expectation of privacy in a school locker. The court concluded that a student does have a legitimate expectation of privacy in a school locker which is provided to the student for the storage of personal items, but that this expectation of privacy is not absolute. Accordingly, the court held that the student's privacy interest will give way in direct relation to the school's need to maintain order and discipline when reasonable cause exists to justify an intrusion upon the student's privacy. However, in the *Dumas* case no such reasonable cause was found, since the assistant principal was unable to articulate any reasons for his suspicion that Dumas was involved in drug use and or sale.

whether the expectation is reasonable in light of all the surrounding circumstances."

With these principles in mind we must now consider, under Pennsylvania law, what a student's reasonable expectation of privacy is within the unique setting of the school environment.[9] Students are subject to a myriad of rules and regulations regarding their attire, their personal hygiene, restrictions on the nature and character of personal items they are permitted to bring onto school property, and of course, their personal liberty while in school. While in school it is reasonable to conclude that the student possesses some expectation of privacy regarding his or her personal property, and in containers used to carry his or her personal items, e.g. bookbag, gym bag, purse. Generally a student is assigned a school locker within which it is assumed personal property such as, books, coats and purses, will be stored. Common sense dictates that when a student is given permission to store his or her belongings in a locker designated for his or her personal and exclusive use, that student can reasonably expect a measure of privacy within that locker. Common sense further dictates that when the student's use of the locker is expressly conditioned upon the acknowledgment that the locker belongs to the school, that measure of privacy is necessarily limited. Moreover, where school officials make it clear that any device such as a combination lock attached to the locker may be used only with the express permission of the school, and where the school is apprised of the combination thereof, it is reasonable to assume that whatever legitimate measure of privacy the student possesses is limited.[10] *See In Interst of Dumas,* 357 Pa.Super. 294, 515 A.2d 984 (1986).

The limits of that expectation of privacy must be ascertained by considering the reasonable needs of the school to, first and foremost, protect the safety and welfare of all the students, to ensure school discipline and compliance with

**9.** The reference to students through-out this opinion is limited to primary and secondary students within the public schools.

**10.** We note that schools may assign students the use of lockers without doors, thus, making most of this discussion irrelevant.

school regulations, and to maintain school property, which includes the school's lockers. The need to protect all the students, to ensure school discipline, and protect school property, limits the student's expectation of privacy while in the school environment.

■ Having determined that public school students do possess a privacy interest, albeit a limited one, protected by the Pennsylvania Constitution, we must now consider if that privacy interest was violated during the school-wide locker search at Harborcreek High School on April 12, 1994. The facts of the instant case require that we consider whether a general search of every student locker is compatible with the protection against unreasonable searches provided under Article I, Section 8 of the Pennsylvania Constitution, in light of the specific needs and concerns of the school that were present in this case.[11]

11. Appellee also argues that this search must fail under the Pennsylvania Constitution as there was no probable cause to search his locker. In *T.L.O.* the United States Supreme Court decided that probable cause was too high a standard to be required when considering the immediacy of the need of school officials to maintain order and discipline while providing a safe environment for all the students, as balanced with the minimal intrusion upon the student in having his/her purse or, as in this case, locker searched. Thus, the Court adopted the reasonable suspicion standard as articulated in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

The *Terry* doctrine which was premised upon the immediacy of the situation has been adhered to by Pennsylvania courts since *Commonwealth v. Hicks*, 434 Pa. 153, 253 A.2d 276 (1969). As we have long recognized in Pennsylvania certain situations, by their particular nature, warrant an exception to the probable cause standard. *Commonwealth v. Melendez*, 544 Pa. 323, 676 A.2d 226 (1996); *Commonwealth v. Lagana*, 517 Pa. 371, 537 A.2d 1351 (1988); *Commonwealth v. Cortez*, 507 Pa. 529, 491 A.2d 111 (1985); *Commonwealth v. Lovette*, 498 Pa. 665, 450 A.2d 975 (1982); *Commonwealth v. Anderson*, 481 Pa. 292, 392 A.2d 1298 (1978).

The justification for the *Terry* doctrine is the observance of suspicious behavior which signals to the trained observer the possibility of either recent or imminent criminal conduct. This rationale supporting the *Terry* doctrine makes great sense in application to school search situations. School officials are keen observers of student conduct, and they need to possess the ability to act quickly when they observe suspicious behavior signaling either the imminent danger of, or the recent occurrence of, a discipline problem that could disrupt the school environment. Given our determination that public school students possess

46

 We begin our analysis here with the concept of general searches as they are tolerated in Pennsylvania. The focus of the court in reviewing the constitutionality of a general search always centers on the reasonableness of the decision to conduct a search of such a broad nature. The determination of whether a general search is reasonable requires a balance of the competing concerns. Where the objective of the search outweighs the intrusion occasioned by the search it will be reasonable, and thus, constitutional to conduct a general search. *Commonwealth v. Tarbert,* 517 Pa. 277, 535 A.2d 1035 (1987); *Commonwealth v. Blouse,* 531 Pa. 167, 611 A.2d 1177 (1992).

Although the issue of general searches on school premises has never been considered, this court has addressed the issue of systematic general searches in the area of police roadblocks intended to ascertain whether drivers were operating their vehicles under the influence of alcohol or in violation of other sections of the motor vehicle code in *Tarbert* and *Blouse.* In determining whether the decision to conduct the roadblocks was reasonable the court balanced the state interest in removing dangerous drivers from the highways, an interest found to be of grave importance, against the intrusion suffered by the drivers during the investigation, an intrusion that was determined to be minimal. *Tarbert,* 517 Pa. at 291–94, 535 A.2d at 1042–43; *Blouse,* 531 Pa. at 171–73, 611 A.2d at 1179–80.

In *Tarbert,* where this court first addressed the constitutionality of general searches, the roadblock was setup for the specific purpose of removing drunk drivers from the highway. There the court found that drunk drivers pose a serious danger in the cost to human life. Drunk drivers also escalate economic costs state-wide in property damage and increased

only a limited privacy interest in their school lockers the *Terry* doctrine, rather than the stricter probable cause requirement is an appropriate approach to search situations which arise in the school setting.

Thus, we find Pennsylvania jurisprudence does support searches of school students and/or their lockers based upon reasonable suspicion. However, we do not believe that an analysis of reasonable suspicion in the *Terry* sense is necessary to our resolution of this case because this was not a search of "appellee's" locker, rather it was a search of all 2,000 lockers in Harborcreek High School.

insurance premiums. Thus, the court found the Commonwealth possessed a compelling interest in removing drunk drivers from the highway.

In considering the intrusion occasioned by forcing drivers to pull over at a roadblock, the court found that the drivers were inconvenienced by the roadblock and their privacy was invaded by the officers' conduct of beaming a flashlight into the car to observe possible signs of intoxication. However, this intrusion was kept to a minimum as the roadblock was conducted in accordance with clearly established guidelines designed to control any potential abuses of discretion that could arise in a roadblock situation. *Tarbert*, 517 Pa. at 293, 535 A.2d at 1043. Thus, the court found the balance to tip in favor of the roadblock given the compelling interest in keeping the roadways safe for the public as a whole when juxtaposed with the minor inconvenience suffered by the drivers stopped in the roadblock. The court concluded that systematic roadblocks will be constitutionally valid where the state interest in conducting the roadblock outweighs the privacy interest of the citizens affected by the intrusion created during a roadblock investigation.[12]

In applying the principles of *Tarbert* to the instant case, we must first examine the interest of the school district in performing general locker searches. As stated previously, the danger of illicit drug use by school children is a concern that must be addressed by various segments of our society, including our school officials who face this problem and its consequences on a daily basis. It would be disingenuous to deny the serious reality of drug use by public school students. The judiciary is in an unenviable position from which to observe the horrors caused by illicit drugs in present society.

12. In *Tarbert*, however, the roadblocks at issue were found invalid as the law enforcement officials conducting same had exceeded their authority. At the time the particular roadblocks at issue were established the Vehicle Code did not provide police officers with the authority to engage in systematic vehicle roadblock investigations. Subsequently the legislation was amended to cure this defect. 517 Pa. at 297, 535 A.2d at 1045. *See,* 75 Pa.C.S. § 6308(b) amended by Act of June 19, 1985, P.L. 49, No. 20, § 10.

Primary and secondary school students are extremely vulnerable to the dangers of drug use. Drug use can and often does rob individuals of their ability to reason and to function as independent worthwhile members of society. Primary and secondary school students are entrusted to our public schools for the purpose of educating them so that they may become independent worthwhile members of society. Protecting students from the dangers of drugs is certainly a compelling and important interest of the school district.

Having found a compelling interest on behalf of the school district in combating the presence of drugs in the school environment, we next consider the level of intrusion suffered by the students subject to generic locker searches. In considering the level of intrusion occasioned by this general search we look to the privacy interests of the students and the guidelines under which the search was conducted.

The Harborcreek High School Code of Student Conduct in effect on April 12, 1994 forewarned students that their lockers were subject to a search by school officials without prior warning to the students "where school authorities have a reasonable suspicion that the locker contains materials which pose a threat to the health, welfare and safety of students in the school." (Code of Student Conduct—1994, R.R. at 142a). The objective of the search of Harborcreek High School on April 12, 1994 was to alleviate concerns for the welfare and safety of the entire student body which had arisen regarding drug use within the school. (R.R. 89a). The date and time of the search were scheduled several weeks in advance by the principal, who also arranged to have the students remain out of the hallways during the search process, for their own safety. (R.R. 90a). The scope of the search was also predetermined. The drug dogs were specifically employed to limit the intrusion occasioned by the decision to search the entire school.[13] According to the prior arrangements, only the lock-

13. This court first discussed the use of drug dogs as law enforcement tools in the case of *Commonwealth v. Johnston*, 515 Pa. 454, 530 A.2d 74 (1987). In *Johnston*, the court held that a dog sniff is a search under Pennsylvania law. However, the court found that a warrant would not

ers upon which the dogs alerted and those adjacent thereto were actually opened and the objects therein searched. (R.R. 91a, 117a, 132a). The guidelines established and followed by the Harborcreek School District for the April 12, 1994 search satisfy the concerns raised in *Tarbert* as they effectively addressed the possibility of an abuse of discretion by the officials conducting the actual search. Given the fact that the students possessed only a limited right of privacy within their lockers; that they were forewarned of the possibility of their lockers being searched; and that the search as conducted followed stringent guidelines, we conclude that the general search of the lockers in this instance represents only a minimal intrusion of the privacy rights at stake.

In keeping with our *Edmunds* analysis we turn now to a consideration of case law from other jurisdictions for additional guidance.

Upon studying the decisions of our sister states which have addressed the problem of school searches, we find that no jurisdiction, with the possible exception of Massachusetts,[14] has recognized greater protection for the privacy rights of public school students under their state constitutions than that provided by the Fourth Amendment. Several jurisdictions have addressed the issue of school searches in accordance with the framework developed in *T.L.O.*, however, to date, we find no state court decisions specifically analyzing the applicability of *Acton* under state constitutional principles.

be required prior to a sniff search when the canine is legitimately in the place where the sniff is conducted and articulable reasonable grounds exist for believing that drugs may be present in the place subjected to the sniff search. Based upon the discussion herein it is clear the canine was brought into the Harborcreek High School on the proper authorization of the school district, and that the school district had articulated reasonable grounds for believing that drugs would likely be found on school property. Thus, we find the requirements of *Johnston* were satisfied in this particular case.

14. Massachusetts has not directly addressed the issue under its state constitution. In *Commonwealth v. Snyder*, 413 Mass. 521, 597 N.E.2d 1363 (1992) the Massachusetts Supreme court declined to reach the issue finding that the school officials had probable cause to search the student's locker, thus, the court did not need to decide if the *T.L.O.* reasonable suspicion standard met state constitutional guidelines.

Each of the jurisdictions which has considered this issue since *T.L.O.* has agreed with the United States Supreme Court that probable cause is too high a standard to effectively allow school officials to render the immediate actions necessary to ensure safety and discipline within the school environment when the situation requires that a search be conducted within the school setting.[15] *See: State v. Joseph T.*, 175 W.Va. 598, 336 S.E.2d 728 (1985)(reasonable suspicion standard provides sufficient protection of the public school students' state constitutional security against unreasonable searches while also protecting the need of the state's educational system to prevent disruptive or illegal conduct by public school students); *In the Interest of P.E.A.*, 754 P.2d 382 (Colo.1988)(reasonable suspicion standard of *T.L.O.* is consistent with enhanced state protections for minors when balanced against the substantial state interest in preventing drug use in the schools); *In the Matter of Gregory M.*, 82 N.Y.2d 588, 592, 606 N.Y.S.2d 579, 581, 627 N.E.2d 500, 502 (1993) (*T.L.O.* standard is consistent with state constitutional protection of privacy rights of minors "given the special responsibility of school teachers ... and the grave threat, even lethal threat, of drug abuse among school children."). *In Re: Joseph G.*, 32 Cal. App.4th 1735, 38 Cal.Rptr.2d 902 (1995) (*T.L.O.* reasonable suspicion standard is consistent with state law, given the

**15.** In fact, the State of Florida applied the reasonable suspicion standard to *school* searches before the United States Supreme Court's *T.L.O.* decision. In *State of Florida v. D.T.W.*, 425 So.2d 1383 (Fla. App.1 Dist.1983), the court upheld the search of a student's car parked in the school parking lot after a teacher's aide, while making a routine check, saw a "bong" inside the student's car. The court agreed that the aide's observation of known drug paraphernalia created sufficient reasonable suspicion to search the vehicle. The court found that searches of school students by school officials were more properly carried out under the lesser standard of reasonable suspicion than the higher standard of probable cause. The court found this conclusion sound premised upon the unique relationship that exists between students and teachers. The students are compelled by law to attend school and the teachers, acting in loco parentis, are charged by law with the duty to control and discipline the students. Thus, the public interest in maintaining an atmosphere free from dangerous illegal items or substances, justifies a lowered expectation of privacy on the part of the students. *D.T.W.*, 425 So.2d at 1385

heightened interest in student safety.) [16]

The reasonable suspicion standard as enunciated in *T.L.O.* has met with approval in the most disparate of jurisdictions. Wisconsin, which traditionally follows the lead of the United States Supreme Court on issues involving search and seizure, *State v. Fry*, 131 Wis.2d 153, 388 N.W.2d 565 (1986), had prior to *T.L.O.* routinely rejected the argument that school students had any privacy interest subject to the protection of the Fourth Amendment. *Interest of L.L.*, 90 Wis.2d 585, 280 N.W.2d 343 (1979). Subsequently the Wisconsin court recognized the privacy rights of school children as set forth in *T.L.O.* in their decision in *Isiah B. v. State*, 176 Wis.2d 639, 500 N.W.2d 637 (1993). However, in *Isiah B.*, the school district maintained a written policy retaining ownership and possessory control of all lockers. Thus, the Wisconsin Court found no need to apply the *T.L.O.* standard as the court concluded that a student could not have possessed a reasonable expectation of privacy in the locker given the stated school policy. The Wisconsin court accepted *T.L.O.* only because it was required to follow the decisions of the United States Supreme Court as setting the minimum level of constitutional protection below which none of the states may fall.

At the other end of the spectrum, Louisiana has always recognized a higher degree of privacy under its state constitution. Prior to *T.L.O.* the Louisiana Courts had specifically held that the Fourth Amendment and Article I, Section 5 of the Louisiana State Constitution provided full protection to students so that probable cause was required for an in school search. *State v. Mora*, 307 So.2d 317 (La.1975) *on remand* 330 So.2d 900 (La.1976) *cert. den'd.* 429 U.S. 1004, 97 S.Ct. 538, 50 L.Ed.2d 616 (1976). Following *T.L.O.*, in the case of *State v. Barrett*, 683 So.2d 331 (La.Ct.App.1996) the Louisiana Court reconsidered *Mora* and specifically overruled it finding that the reasonable suspicion standard of *T.L.O.* was better

**16.** We do not infer that our list of sister states is comprehensive. However, as we found no jurisdiction which rejected *T.L.O.*, we have merely limited our discussion to a sampling of cases, the reasoning of which is illustrative of the various jurisdictions which have reviewed this issue.

suited to searches conducted in the school setting. In *Barrett,* the court accepted the conclusion of *T.L.O.* that students have a reduced expectation of privacy within the school setting. Further, the *Barrett* court acknowledged the stated policy goal of the Louisiana legislature to eradicate the serious problem of alcohol, drug and substance abuse among students. *Id.* 683 So.2d at 338. The *Barrett* court concluded that the lesser standard of reasonable suspicion provided adequate constitutional protection to students where the search was unobtrusive given the severity of the need met by the search. *Id.*[17]

Although *Isiah B.* and *Barrett* were decided prior to the United States Supreme Court decision in *Acton,* we note that the searches as conducted in each of those cases were random general searches. In *Isiah B.* the school policy established that all lockers would be subject to search for contraband at any time. (The policy was motivated by large numbers of students carrying concealed weapons to school). The *Isiah B.* court did not address the constitutionality of the search as a "general" search; they found the students had no privacy interest at all and therefore such an analysis was not necessary. In *Barrett,* a statute subjecting all students to random search at any time without notice was in effect at the time of the search at issue therein. (*See,* La.Rev.Stat.Ann. 17:416.3(A) 1996). There was no argument in the *Barrett* case that the statute was unconstitutional. The *Isiah B.* and *Barrett* decisions do not analyze the same factors as the *Acton* court in their review of general school searches. However, both the Wisconsin and Louisiana courts stressed the important policy goals of keeping their respective public school environments free from weapons and drugs which threaten the safety and welfare of the entire school population. Considering the strong emphasis each of those courts placed upon

---

**17.** The search in *Barrett* was premised upon a positive reaction by a drug dog to the student's wallet. All the students in his classroom had been asked to empty their pockets and leave the room. The dog alerted to Barrett's wallet. The sniff, thus, provided the reasonable suspicion to search the student's locker and car. A dog sniff is not a search under Louisiana state law. *State v. Senegal,* 664 So.2d 832 (La.Ct.App. 1995).

the concern for safety among all the students it is reasonable to conclude that those jurisdictions would also endorse the concepts focused upon by the United States Supreme Court in *Acton.*

Our review of sister states reveals overwhelming unanimity among the various jurisdictions on the question of balancing the privacy rights of minors against the need to maintain safe environments for educating all minors within the public schools. With this great weight of authority endorsing the United States Supreme Court opinion in *T.L.O.,* and our considered opinion that those same jurisdictions will also endorse *Acton* when and if it becomes necessary, we turn to the final portion of our analysis, a consideration of policy concerns unique to Pennsylvania.

In the area of search and seizure, the courts in Pennsylvania have traditionally provided significant protection for the privacy rights of our citizens. *See, Commonwealth v. White,* 543 Pa. 45, 669 A.2d 896 (1995); *Commonwealth v. Brion,* 539 Pa. 256, 652 A.2d 287 (1994); *Commonwealth v. Riedel,* 539 Pa. 172, 651 A.2d 135 (1994); *Commonwealth v. Lewis,* 535 Pa. 501, 636 A.2d 619 (1994); *Commonwealth v. Kohl,* 532 Pa. 152, 615 A.2d 308 (1992); *Stenger v. Lehigh Valley Hospital Center,* 530 Pa. 426, 609 A.2d 796 (1992); *Commonwealth v. DeJohn,* 486 Pa. 32, 403 A.2d 1283 (1979). This clearly established right to be free from unwarranted invasions of privacy by government actors is afforded protection in Pennsylvania where the individual asserting the right possesses a reasonable expectation of privacy at the time the search is initiated. *Commonwealth v. Brundidge,* 533 Pa. 167, 620 A.2d 1115 (1993).

Recognizing a limitation upon the privacy rights of public school students is reasonable notwithstanding Pennsylvania's traditionally high regard for individual privacy. As this Court noted in *Stenger:*

> As the right of privacy is a well-settled part of the jurispru-
> dential tradition in this Commonwealth, we are mindful, as
> ever, to avoid unjustified intrusions into the private zone of
> our citizens' lives. We must bear in mind, however, that the

right is not an unqualified one; it must be balanced against weighty competing private and state interests.

530 Pa. at 434, 609 A.2d at 800. The limitation under consideration is the ability of a public school official to intrude upon the privacy of a student by conducting a search of a school locker used by that student. This intrusion is motivated by extremely important reasons—to locate and remove from the school illegal contraband that is dangerous, not just to the individual student, but to the entire student body. This court would be remiss in its duty if it were to ignore the very real dangers created by the presence of illegal drugs in our public schools. Not only do drugs pose a threat to the students but also the presence of students under the influence of drugs creates serious problems for teachers and other school personnel charged with the duty of educating and safekeeping our children during school hours. The goal of public education, simply put, is to educate our children. Unfortunately, this goal is often impeded by the actions of a few students which interfere with the ability of the Commonwealth to achieve this goal.

We conclude that this decision promotes the well being of our children during their student years. The minimal intrusion of privacy suffered, in the unique setting of the school environment, pales in significance to the public need to be served.

To summarize, we find that general searches by school officials are compatible with the limited protection provided to school students under Article I, Section 8 of the Pennsylvania Constitution, so long as they are carried out based upon neutral, clearly articulated guidelines. Pennsylvania jurisprudence requires that before a general search will pass constitutional muster there must be a state interest at issue, the importance of which outweighs the level of intrusion occasioned by the search. Under the facts and circumstances of this particular case, the privacy interests of the students are minimal and are outweighed by the important objective of keeping drugs out of our public schools in order to make the school environment safe for all the students, an objective that

would be jeopardized by requiring a higher degree of scrutiny in searches conducted by school officials within the school environment.

We conclude, therefore, that the privacy interest of students within the school environment is a limited one entitled to no greater protection under Article 1, Section 8 of the Pennsylvania Constitution than afforded students under the Fourth Amendment to the United States Constitution. The search of the Harborcreek High School on April 12, 1994 was not violative of the Pennsylvania Constitution and the order granting the motion to suppress must be also be reversed on that ground. Although this conclusion is consistent with the United States Supreme Court decisions in *T.L.O.* and *Acton*, we underscore that it was reached based upon independent and adequate state grounds as required by *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).

In applying this conclusion to the case at bar, we reverse the decision of the Superior Court as it was incorrect under both the Fourth Amendment of the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution. The order of the Superior Court is reversed, and the matter is remanded to the trial court for resolution consistent with this decision. Jurisdiction is relinquished.

FLAHERTY, C.J., files a Concurring Opinion joined by NIGRO, J.

ZAPPALA, J., files a Dissenting Opinion.

SAYLOR, J., did not participate in the consideration or decision of this case.

FLAHERTY, Chief Justice, concurring.

Although I agree with the result reached by the majority, I write separately because I arrive at that result by different reasoning.

The majority holds that federal law was not violated by the random searches in this case pursuant to *Vernonia School District v. Acton*, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). *Acton* holds that random searches may be upheld

based on three factors: the nature of the privacy interest of those whose property was searched; the character of the intrusion; and the nature and immediacy of the government concern and the efficacy of the means utilized to address the concern. The majority concludes that the privacy interest of students in school lockers was minimal; the intrusion was minimal; and the government's concern was significant. There was, therefore, under this test, no impermissible search.

With respect to Pennsylvania law, the majority holds that pursuant to *Commonwealth v. Tarbert*, 517 Pa. 277, 535 A.2d 1035 (1987) and *Commonwealth v. Blouse*, 531 Pa. 167, 611 A.2d 1177 (1992) "[w]here the objective of the search outweighs the intrusion occasioned by the search it will be reasonable, and thus, constitutional to conduct a general search." Op. at 360. In other words, if the interest of the government is said to be significant and the intrusion is said to be minimal, the search will be upheld. The majority finds that because drug use in schools is a serious matter and because the students had a minimal expectation of privacy in their lockers (they were forewarned that their lockers might be searched), the search did not violate Article I Section 8 of the Constitution of Pennsylvania.

I concur with the majority's treatment of federal law, but I emphatically disagree with its treatment of Pennsylvania law.

Primarily, I take issue with the majority's reliance on *Tarbert* and *Blouse*, for I cannot agree that the random stops conducted by police in those cases have any legitimacy under Article 1, Section 8 of the Constitution of Pennsylvania or that the circumstances of those cases are similar to the circumstances of the case at bar. Under the patently anomalous decisions in *Tarbert* and *Blouse*—wrongly decided in my view—fundamental constitutional protections against government intrusion vanish when the government claims that a particular problem requires random police searches. This exception to the general requirement of probable cause or reasonable suspicion swallows the entire prohibition against unreasonable searches and seizures, and is, therefore, unconstitutional.

I concur in the result reached by the majority, however, for the following reasons. First, the school environment is sui generis. Students are immature and in danger of harm which adults may be expected to avoid. Further, the harm may be serious, and finally, the mechanism for discovering the harm is not, as in adult society, well-defined. In adult society, the police are charged with the responsibility of arresting those who break laws, but in the society of children, the police function falls primarily to parents and teachers, who have mentoring duties which may supersede their police duties. Thus, it would not be reasonable to expect teachers to conduct investigations and surveillance in order to establish probable cause, although that is exactly what we do expect of police. When school officials, therefore, have particular and articulated reasons to believe that a drug epidemic has invaded the student body and insist that lockers must be searched, the situation is not similar to police expressing a concern that crime has got out of hand and that random searches of persons or cars or places must be conducted.

Second, students are required to be present at school and both they and their parents have a right to expect that their caretakers will provide a reasonable level of protection against drugs and violence.

Third, the lockers at issue belong to the schools and the students in this case had been informed that the school might search the lockers at any time.

And finally, the intrusion in this case was minimal in the context of the foregoing and in light of the minimal expectation of privacy which students had in the lockers.

Thus, I agree that the searches in this case do not violate the Constitution of Pennsylvania. I do not agree, however, that this result can be reached by way of *Tarbert* or *Blouse*.

ZAPPALA, Justice, dissenting.

The Court today holds that Pennsylvania law enforcement officials may utilize a drug detection dog to conduct a general sweep of students' school lockers and thereafter search particular lockers to investigate criminal wrongdoing without proba-

ble cause to believe that any individual student is in possession of illegal narcotics. The Court reaches this result through an erroneous analysis of governing constitutional law. I must therefore dissent.

According to the Opinion Announcing the Judgment of the Court, "[t]he instant case requires this court to decide what degree of scrutiny is appropriate when reviewing a constitutional challenge to a search conducted by public school officials on school property" (Op. at 353), adding in a footnote, "we agree with the factual finding of the trial court that this search was undertaken by the school officials" (Op. at 353, n. 5). This so-called "factual finding" is refuted by the record.

The record reveals that on April 12, 1994, Pennsylvania State Police Trooper J. Donald Normandy, with the assistance of an Erie County Drug Task Force detection dog and its handler, Officer Peter Dragella of the City of Erie Police Department, conducted a general sweep of the 2,000 student lockers at Harborcreek High School in Erie County, Pennsylvania. The sweep was conducted at the request of school officials. During the sweep, any locker which the drug detection dog "alerted" on and any adjacent lockers were opened and searched by Trooper Normandy. Although eighteen lockers were ultimately opened and searched, the only locker found to contain contraband was that of Appellee, eighteen year old Vincent Francis Cass. Therein, Trooper Normandy discovered drug paraphernalia and a small amount of marijuana in the pockets of a jacket.

Appellee was thereafter summoned to the principal's office, where Trooper Normandy read Appellee his *Miranda* [1] rights, requested that Appellee sign a waiver form and questioned Appellee in the presence of the principal, the assistant principal and Officer Dragella. After indicating that he understood his rights, Appellee made an oral statement admitting that the items of contraband were his. Appellee was subsequently charged with one count each of possession of a small amount of marijuana and possession of drug paraphernalia.

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

To characterize the locker search in this case as a search by school officials is to engage in subterfuge. Appellee's school locker was searched by police officers and the contraband seized as a result thereof formed the basis of a criminal prosecution.[2] This case does not present the question of what degree of scrutiny is appropriate when reviewing a constitutional challenge to a search conducted by school officials on school property; rather, it presents the question of what degree of scrutiny is appropriate when reviewing a constitutional challenge to an evidentiary search conducted by police officers on school property.

I

The Fourth Amendment to the United States Constitution provides:

**2.** At the suppression hearing, the principal of Harborcreek High School, Donald Papesch, was questioned on cross-examination as follows:

Q: Now when [the police] brought the dog to the school, did the school officials do the search with the dog?
A: No.
Q: Did the police do the search with the dog?
A: We were with the dog.
Q: I understand. But did the police do the actual search with the dog?
A: Yes.
Q: Are the police officers employees of the school district?
A: No.
Q: They were acting in their capacity as police officers, correct?
A: Yes.
Q: With respect to when the locker was searched, is it true that the only involvement of the school officials at that point was to identify whose locker it was and to open the locker for the police?
A: And look at the material.
Q: And look at the material in conjunction with the police?
A: The police kept on going, they weren't there, they would be down the hall several feet.
Q: Now, were those items turned over to the police?
A: Yes.
Q: And did the police take those into evidence for this criminal prosecution?
A: Yes.

N.T. 10/4/94 at 55–56.

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The Fourth Amendment sets the minimum level of protection from unreasonable searches and seizures below which the states may not fall. *Commonwealth v. Sell*, 504 Pa. 46, 470 A.2d 457 (1983). In determining whether a search violates the Fourth Amendment, the initial question is whether the prohibition against unreasonable searches and seizures applies to the search at issue.

The application of the Fourth Amendment to searches in public schools has been addressed by the United States Supreme Court in two different settings. *See New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985); *Vernonia School District 47J v. Acton*, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). While the decisions in *T.L.O.* and *Vernonia* are instructive generally, the critical distinction between those cases and the instant case is that the searches in *T.L.O.* and *Vernonia* were conducted by school officials, whereas the search conducted in the instant case was conducted by police officers.

In *T.L.O.*, the Court concluded that a search of a student's purse by school officials based upon reasonable suspicion of wrongdoing did not constitute an unreasonable search in violation of the Fourth Amendment. In reaching its decision, the Court first held that the fourth amendment prohibition against unreasonable searches and seizures applies to searches conducted by public school officials. Ten years later in *Vernonia*, the Court addressed the issue of school searches in the context of a school district's policy of mandatory urinalysis testing of student athletes for illegal drugs. The Court began its analysis by noting that under *Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), and *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989),

state-compelled testing of urine constitutes a search under the Fourth Amendment.

In the instant case, before actually opening and searching Appellee's locker, the police conducted a canine sniff of all the lockers at Harborcreek High School. In *Commonwealth v. Johnston*, 515 Pa. 454, 530 A.2d 74 (1987), this Court stated, "we believe that the majority view of the United States Supreme Court would be that [a] canine sniff [carried out on private property and directed at the closed door of a private area] would not constitute a search." 530 A.2d at 78; *see United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). Thus, a canine sniff of lockers at a public school does not constitute a search under the Fourth Amendment.

The inquiry then becomes whether the subsequent search of Appellee's locker constitutes a search subject to the requirements of the Fourth Amendment. In *T.L.O.*, the Court observed:

> We do not address the question, not presented by this case, whether a schoolchild has a legitimate expectation of privacy in lockers, desks, or other school property provided for the storage of school supplies.

469 U.S. at 337 n. 5, 105 S.Ct. at 741 n. 5. However, with regard to the issue before it, the Court reasoned:

> Although this Court may take notice of the difficulty of maintaining discipline in the public schools today, the situation is not so dire that students in the schools may claim no legitimate expectations of privacy. We have recently recognized that the need to maintain order in a prison is such that prisoners retain no legitimate expectations of privacy in their cells, but it goes almost without saying that "[t]he prisoner and the schoolchild stand in wholly different circumstances, separated by the harsh facts of criminal conviction and incarceration." *Ingraham v. Wright, supra,* 430 U.S. [651], at 669, 97 S.Ct. [1401], at 1411, [51 L.Ed.2d 711 (1977)]. We are not yet ready to hold that the schools and

the prisons need be equated for purposes of the Fourth Amendment.

Students at a minimum must bring to school not only the supplies needed for their studies, but also keys, money, and the necessaries of personal hygiene and grooming. In addition, students may carry on their persons or in purses or wallets such nondisruptive yet highly personal items as photographs, letters, and diaries. Finally, students may have perfectly legitimate reasons to carry with them articles of property needed in connection with extracurricular or recreational activities. In short, schoolchildren may find it necessary to carry with them a variety of legitimate, non-contraband items, and there is no reason to conclude that they have necessarily waived all rights to privacy in such items merely by bringing them onto school grounds.

*Id.* at 338–339, 105 S.Ct. at 741.

Similarly, there is no reason to conclude that students have necessarily waived all rights to privacy in items they find necessary to bring onto school grounds merely by placing such items in a school locker. A student does retain a legitimate expectation of privacy in a school locker under the Fourth Amendment. To hold otherwise would equate school lockers and prison cells for purposes of the Fourth Amendment.[3]

3. The majority's analysis of this question places unwarranted significance on the Harborcreek High School Code of Student Conduct (Code). If this case merely involved a search of school lockers by school officials, discussion of the Code in relation to the students' expectation of privacy would be entirely appropriate. However, when it is police officers who conduct a search of the school lockers, the Code is of no moment. The Code provides:

> *School authorities* may search a student's locker and seize any illegal materials. Such materials may be used as evidence against the student in *disciplinary proceedings*. Prior to a locker search a student shall be notified and given an opportunity to be present. However, where *school authorities* have a reasonable suspicion that the locker contains materials which pose a threat to the health, welfare and safety of the students in the school, students' lockers may be searched without prior warning.

(Code, R.R. at 142a) (emphasis added). Police officers are neither school officials nor "school authorities," and "disciplinary proceedings" are entirely different from criminal proceedings. "[W]hatever may be the consent to the discretion of the school officials deemed

Having concluded that the Fourth Amendment applies to school lockers, it must then be determined whether the subsequent search of Appellee's locker comports with the Fourth Amendment. In *T.L.O.*, the Court reasoned:

It is evident that the school setting requires some easing of the restrictions to which searches by public authorities are ordinarily subject. The warrant requirement, in particular, is unsuited to the school environment: requiring a school teacher to obtain a warrant before searching a child suspected of an infraction of school rules (or of the criminal law) would unduly interfere with the maintenance of the swift and informal disciplinary procedures needed in the schools. Just as we have dispensed with the warrant requirement when "the burden of obtaining a warrant is likely to frustrate the government purpose behind the search," *Camara v. Municipal Court,* 387 U.S. [523], at 532–533, 87 S.Ct. [1727], at 1733 [18 L.Ed.2d 930 (1967)], we hold today that school officials need not obtain a warrant before searching a student who is under their authority.

469 U.S. at 340, 105 S.Ct. at 742. Instead of applying the traditional fourth amendment standard of probable cause to assess the validity of a search, the Court held that a search of a student by a school official is constitutional upon a showing of "reasonableness." In *Vernonia,* the Court stated:

A search unsupported by probable cause can be constitutional, we have said, "when special needs, beyond the normal need for law-enforcement, make the warrant and probable-cause requirement impracticable." *Griffin v. Wisconsin,* 483 U.S. 868, 874, 107 S.Ct. 3164, 3168, 97 L.Ed.2d 709 (1987) (internal quotation marks omitted).

We have found such "special needs" to exist in the public-school context. There, the warrant requirement "would unduly interfere with the maintenance of swift and informal disciplinary procedures [that are] needed," and "strict

constructively made by parent or student, it cannot vitiate the constitutional expectation of privacy which creates the need for levels of suspicion and/or exigency in the conduct of a criminal investigation." *Picha v. Wielgos,* 410 F.Supp. 1214, 1221 (N.D.Ill.1976).

adherence to the requirement that searches be based upon probable cause" would undercut "the substantial need of teachers and administrators for freedom to maintain order in the schools." *T.L.O., supra,* 469 U.S. [325], at 340, 341, 105 S.Ct. [733], at 742, [83 L.Ed.2d 720 (1985)].

515 U.S. at 653, 115 S.Ct. at 2391.

Thus, *T.L.O.* and *Vernonia* stand for the proposition, as stated in *T.L.O.,* "that the school setting requires some easing of the restrictions to which searches by public authorities are ordinarily subject." 469 U.S. at 340, 105 S.Ct. at 742. However, the Court in *T.L.O.* explicitly limited its holding by stating:

[We do not] express any opinion on the standards (if any) governing searches of such areas by school officials or by other public authorities acting at the request of school officials.

*Id.* at 338 n. 5, 105 S.Ct. at 741 n. 5. The Court re-emphasized this limitation by further stating:

We here consider only searches carried out by school authorities acting alone and on their own authority. This case does not present the question of the appropriate standard for assessing the legality of searches conducted by school officials in conjunction with or at the behest of law enforcement agencies, and we express no opinion on that question.

*Id.* at 342 n. 7, 105 S.Ct. at 743 n. 7. The Court in *Vernonia* also implicitly acknowledged this distinction:

Despite the fact that, like routine school physicals and vaccinations ... the search here is undertaken for prophylactic and distinctly *non* punitive purposes (protecting student athletes from injury, and deterring drug use in the student population) ... the dissent would nonetheless lump this search together with "evidentiary" searches, which generally require probable cause....

515 U.S. at 658 n. 2, 115 S.Ct. at 2393 n. 2 (citations omitted).

Thus, the United States Supreme Court has not spoken on the appropriate standard in a public school setting for assessing the legality of an evidentiary search conducted by police

officers and forming the basis of a criminal prosecution, as in the instant case. However, the preceding quotation seems to suggest that "evidentiary" searches conducted by law enforcement officials for the purposes of investigating criminal conduct require probable cause.

In *Picha v. Wielgos,* 410 F.Supp. 1214 (N.D.Ill.1976), the United States District Court for the Northern District of Illinois came to that very conclusion. In *Picha,* a public school principal received a telephone call leading him to suspect several students of possession of illegal drugs. The principal summoned the police at the direction of the school superintendent. After the police arrived, each student was separately searched by the school nurse and school psychologist. The court ruled that the police could not constitutionally "cause a search in the absence of probable cause [to believe that the students] possessed an illegal material at the time of the search." 410 F.Supp. at 1221. The court noted:

Although the school may have an interest in the safety of its charges, either with regard to one student possessing drugs, or with regard to the possibility that that student would transfer possession of drugs to another student, all it can do in furtherance of that interest is to locate and perhaps confiscate the drugs.

\* \* \*

[T]he substantial state interest in the provision of education and the maintenance of school discipline cannot be here said to temper the application of the Constitution to a search caused by police for evidence of crime.

*Id.* at 1220–1221. I find this reasoning persuasive.

The "special needs" that prompted the United States Supreme Court in *T.L.O.* and *Vernonia* to "ease the restrictions to which searches by public authorities are ordinarily subject" and to adopt a reasonableness standard—"the preservation of swift and informal disciplinary procedures needed in the schools" and "the substantial need of teachers and administrators for freedom to maintain order in the schools"—cannot be construed or applied so as to legitimize an investigation by

police officers aimed at obtaining evidence to be used in a criminal prosecution. By applying the "reasonableness" standard to the search here at issue, the majority errs in transferring an evaluation of the special needs of public school officials from the context in which the United States Supreme Court developed it to the different and more expansive context of seizures directed at the discovery and punishment of criminal activity.

Furthermore, to fail to apply the probable cause standard to the criminal investigation in this case solely on the basis that the subjects of that investigation are schoolchildren is to equate schoolchildren with probationers and parolees for purposes of the Fourth Amendment.[4] This error is all the more egregious when the *schoolchild* in the instant case is in actuality an eighteen year old who has ascended from the age of minority.

A search conducted by police officers in a public school setting for the purposes of penal law enforcement, even when conducted at the request of school officials, must be supported by probable cause in order to comport with the Fourth Amendment.

The United States Supreme Court has stated:

In enforcing the Fourth Amendment's prohibition against unreasonable searches and seizures, the Court has insisted upon probable cause as the minimum requirement for a reasonable search permitted by the Constitution. As a general rule, it has also required the judgment of a magistrate on the probable-cause issue and issuance of a warrant before a search is made. Only in exigent circumstances will the judgment of the police as to probable cause serve as a sufficient authorization for a search.

*Chambers v. Maroney*, 399 U.S. 42, 51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970).

4. *See Scott v. Pennsylvania Board of Probation and Parole,* 548 Pa. 418, 698 A.2d 32 (1997) (holding that although probationers and parolees have a privacy interest protected by the Fourth Amendment, it is a more narrowly protected privacy interest than that afforded a free individual).

Turning to the instant case, it is undisputed that after the drug detection dog "alerted" on Appellee's locker, the locker was immediately opened and searched by Trooper Normandy without a search warrant. That search was unsupported by either probable cause or exigent circumstances.

The mere fact that the drug detection dog alerted on Appellee's locker falls short of establishing the requisite probable cause for a search. Implicit in the fact that it was necessary to search any lockers adjacent to those alerted on by the drug detection dog is the conclusion that the police officers could not reasonably rely upon the dog's particularized detection. Otherwise, there would have been no reason for the officers to search the adjacent lockers. At the suppression hearing, Officer Dragella was questioned as to whether the fact that in seventeen of the eighteen "hits" made by the drug detection dog, no contraband was found meant that the drug detection dog was unreliable. Officer Dragella explained, "[w]ell, we can't say that those are non finds because if he's smelling odor, there still could be hits even though we don't find anything. He's working on the odor, not the actual substance" (N.T. 10/4/94 at 84). Thus, the fact that the drug detection dog alerted on Appellee's locker, at its best, could only have provided the police officers with the knowledge that the *odor* of contraband was present in either Appellee's locker or those adjacent thereto. Coupled with the fact that the police officers had no other information that Appellee's locker might contain contraband,[5] probable cause was clearly lacking.[6]

5. At the suppression hearing, Trooper Normandy answered the following question on cross-examination:

 Q: And what was your reasonable suspicion that Mr. Cass was involved with drugs or had drugs in his locker?

 A: I had no knowledge of Mr. Cass prior to the search, it was based on the findings of the dog.

N.T. 10/4/94 at 71.

6. Even assuming *arguendo* that probable cause existed to believe that Appellee's locker contained contraband, there were no exigent circumstances excusing the warrant requirement. As stated in the Opinion Announcing the Judgment of the Court: "The school principal announced to the students that morning that a safety inspection would be

Accordingly, I must conclude that the search of Appellee's locker and the seizure of the contraband found therein constituted a violation of Appellee's rights under the Fourth Amendment of the United States Constitution.

## II

Article 1, Section 8 of the Pennsylvania Constitution provides:

The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

"Article 1, Section 8 of the Pennsylvania Constitution, as consistently interpreted by this Court, mandates greater recognition [than the Fourth Amendment] of the need for protection from illegal government conduct offensive to the right of privacy." *Commonwealth v. Sell*, 504 Pa. 46, 67, 470 A.2d 457, 468 (1983).

In *Commonwealth v. Johnston*, this Court held that under Article 1, Section 8, a balancing approach weighing the privacy expectations of the individual against the interests of law enforcement in order to determine whether an unreasonable search or seizure had occurred, is only appropriate in the *Terry* [7] context of exigent circumstances where a police officer's trained on-the-spot observations call for necessarily swift action which as a practical matter cannot be subject to the warrant requirement. In so doing, this Court specifically

conducted. The students were to remain in class until the inspection was completed" (Op. at 352). With all of the students of Harborcreek High School, including Appellee, confined to their classrooms, there was no exigency that could excuse a failure by police officers to procure a warrant.

7. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). This Court adopted the rationale of *Terry* in *Commonwealth v. Hicks*, 434 Pa. 153, 253 A.2d 276 (1969).

rejected the balancing analysis utilized by the United States Supreme Court in *United States v. Place*.[8]

While the analysis under Article 1, Section 8 does not require a balancing to determine whether a search took place, a balancing analysis is appropriate in determining whether a search implicates the warrant requirement. In *Johnston*, this Court performed that balancing inquiry with regard to canine sniff-searches. There, we held that under Article 1, Section 8, a narcotics detection dog may be deployed to test for the presence of narcotics where: (1) the police are able to articulate reasonable grounds for believing that drugs may be present in the place they seek to test; and (2) the police are lawfully present in the place where the canine sniff is conducted. 515 Pa. at 465–466, 530 A.2d at 79. However, absent from the *Johnston* test is a requirement of probable cause, supplanted instead by articulable reasonable grounds for suspicion.[9]

Turning to the search in the instant case, while the police officers were lawfully present at Harborcreek High School, satisfying the second prong of the *Johnston* test, the facts surrounding the search fail to establish the articulable reasonable grounds for suspicion necessary to satisfy the first prong. The search here at issue was a general sweep of the 2,000 student lockers at Harborcreek High School. Articulable reasonable grounds for suspicion were plainly absent.

Nevertheless, the Opinion Announcing the Judgment of the Court justifies this general search by relying on this Court's

8. Thus, while the canine sniff of the 2,000 lockers at Harborcreek High School is not considered a search under the Fourth Amendment, it is considered a search under Article 1, Section 8.

9. That holding was based on the following factors:
 [A] canine sniff-search is inherently less intrusive upon an individual's privacy than other searches such as wiretapping or rummaging through one's luggage; it is unlikely to intrude except marginally upon innocent persons; and an individual's interest in being free from police harassment, annoyance, inconvenience and humiliation is reasonably certain of protection if the police must have a reason before they may, in the circumstances of this case, utilize a narcotics detection dog.
 515 Pa. at 466, 530 A.2d at 79–80.

decisions in *Commonwealth v. Tarbert*, 517 Pa. 277, 535 A.2d 1035 (1987), and *Commonwealth v. Blouse*, 531 Pa. 167, 611 A.2d 1177 (1992). Mr. Chief Justice Flaherty, in his Concurring Opinion, precisely expresses why reliance on *Tarbert* and *Blouse* is misplaced, stating,

> I cannot agree that the random stops conducted by police in those cases have any legitimacy under Article 1, Section 8 of the Pennsylvania Constitution or that the circumstances of those cases are similar to the case at bar. Under the patently anomalous decisions in *Tarbert* and *Blouse*— wrongly decided in my view—fundamental constitutional protections against government intrusion vanish when the government claims that a particular problem requires random police searches. This exception to the general requirement of probable cause or reasonable suspicion swallows the entire prohibition against unreasonable searches and seizures, and is, therefore, unconstitutional.

Concurring Op. at 366.[10]

Notwithstanding the misplaced reliance on *Tarbert* and *Blouse*, the Opinion Announcing the Judgment of the Court further errs by finding that the requirements of *Johnston* were satisfied in the instant case. What the Opinion Announcing the Judgment of the Court ignores is the fact that in *Johnston*, after conducting the canine-sniff of the storage locker which the police suspected of containing contraband, the police sought and obtained a search warrant. As no such warrant was sought in the instant case and there were no exigent circumstances (*see* text accompanying note 6), regardless of the legality of the canine-sniff, when the police officers

10. However, the rationale expressed by Mr. Chief Justice Flaherty for concurring in the result reached in the Opinion Announcing the Judgment of the Court suffers from the same infirmity the rationale of the Opinion Announcing the Judgment of the Court suffers from—the foundation upon which both are built is the characterization of the search here at issue as one by school officials. The Concurring Opinion's *sui generis* analysis is inappropriate when considering a search conducted by police officers in a public school setting for the purposes of penal law enforcement. By inaccurately characterizing the search here at issue as one made by school officials, the Concurring Opinion erroneously sanctions the exact type of random police search it simultaneously condemns in *Tarbert* and *Blouse*.

subsequently opened and searched Appellee's locker, they violated Appellee's right to be free from unreasonable searches and seizures.

Accordingly, I must conclude that the search of Appellee's locker and the seizure of the contraband found therein constituted a violation of Appellee's rights under Article 1, Section 8 of the Pennsylvania Constitution.

For the foregoing reasons, I would affirm the Order of the Superior Court. I therefore respectfully dissent.