620 A.2d 1115

COMMONWEALTH of Pennsylvania, Appellant,

v.

Robert L. BRUNDIDGE, Appellee.

Supreme Court of Pennsylvania.

Submitted Dec. 7, 1992.

Decided Feb. 18, 1993.

Gregory L. Lensbower, Hanover, John F. Nelson, Chambersburg, for appellant.

Todd A. Dorsett, Waynesboro, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, ZAPPALA, PAPADAKOS, CAPPY and MONTEMURO, JJ.

## OPINION OF THE COURT

LARSEN, Justice.

This is an appeal from the order of the Superior Court, 404 Pa.Super. 106, 590 A.2d 302, reversing the judgment of sentence imposed by the Franklin County Court of Common Pleas following the conviction of appellee, Robert L. Brun-

didge, of possession of a controlled substance with intent to deliver and conspiracy and remanding for a new trial. The issue presented is whether the trial court properly denied appellee's motion to suppress when it admitted evidence of cocaine which was originally found when police conducted a warrantless search of a jacket which was covered with plastic and hanging in a closet in a motel room one-half hour after checkout time and then later obtained after a valid warrant was obtained.

In reviewing a trial court's denial of a motion to suppress, the appellate court's responsibility is to determine whether the record supports the factual findings of the suppression court and the legitimacy of the inferences and legal conclusions drawn from those findings. *Commonwealth v. Hughes*, 521 Pa. 423, 438, 555 A.2d 1264, 1271 (1989). In making this determination, we will consider the evidence of the prosecution's witnesses and so much of the evidence of the defense as, read in the context of the record as a whole, remains uncontradicted. *Id.*, 521 Pa. at 438, 555 A.2d at 1271–72 (*quoting Commonwealth v. Kichline,* 468 Pa. 265, 280–81, 361 A.2d 282, 290 (1976)).

The facts, viewed in light of the foregoing standard, are as follows: On August 25, 1987, appellee, Robert L. Brundidge registered for one room, Room 307, at the Greencastle Travelodge Motel for one night for a party of two: himself and his companion, James Jackson. Appellee listed his home address as Haines City, Florida. Pursuant to motel policy, the front desk clerk ordinarily informed motel guests that checkout time is twelve noon.

Several motel employees observed appellee and Jackson together on the evening of August 25th. They left the motel at approximately twelve midnight, and did not return that night. The following day, at approximately twelve noon, Dorcas Sheffield, the executive housekeeper, telephoned Room 307 pursuant to usual motel procedure, to determine whether the occupants wished to retain the room for a second night. When she received no answer, she entered the room to

prepare it for the next guest. She found that the beds had not been slept in the previous night. On one of the beds she found a diagram of the motel floor plan labelled "front desk" with the handwritten name "James Q. Jackson" on it. On a table she found several one-inch square clear plastic bags.

Ms. Sheffield was alarmed by the diagram in particular because, only two weeks before, a motel guest had perpetrated an armed robbery of the front desk. She went to the motel manager, Norman Reed, to report what she found in the room. State Trooper Gary Bopp, an undercover narcotics agent, was in the manager's office at the time investigating an unrelated matter. The manager and Trooper Bopp went with Ms. Sheffield to Room 307. Trooper Bopp waited outside while Sheffield and Reed investigated. After Reed determined that no other persons were in the room, he asked Trooper Bopp to enter.

At approximately 12:20 p.m., Trooper Bopp entered Room 307 and observed in plain view the diagram and the small plastic bags, which he recognized as the kind of bags used for packaging small quantities of controlled substances. He proceeded to search the room. In the only closet, he found a jacket with a protective bag over it. He searched the jacket, and in a pocket, he found a plastic bag inside another plastic bag filled with a white powder which was later determined to be 206.6 grams of pure cocaine. He removed a small sample of the powder for field testing and replaced the bag in the jacket pocket. Field testing erroneously indicated that the substance was methamphetamine. The trooper then telephoned the District Attorney's office regarding the need for a search warrant, and telephoned police headquarters for assistance.

At 12:45 p.m., appellee and Jackson returned to the motel. Shortly thereafter, appellee registered for a second night. The two were kept under surveillance by state police while Trooper Bopp obtained a search warrant. At approximately 3:00 p.m., appellee and Jackson attempted to exit the motel. State police officers ordered them to halt. Appellee stopped, but Jackson attempted to flee and was shot by an officer.

Trooper Bopp returned with search warrants for the motel room and appellee's and Jackson's cars. Trooper Bopp seized the diagram, plastic bags, and bag of cocaine he previously found. Trooper Paul searched both appellee's and Jackson's cars. From Jackson's car, he seized an empty "Skoal" chewing tobacco can containing a white residue and a razor blade, an unregistered gun, and three rounds of ammunition. He found no incriminating evidence in appellee's car.

Appellee was arrested and charged with possession of a controlled substance with intent to deliver[1] and conspiracy.[2] Appellee and Jackson were tried separately. Appellee filed a pretrial motion to suppress the cocaine, which was denied. The trial court found that the appellee and Mr. Jackson had no reasonable expectation of privacy in Room 307 or anything found therein once checkout time had arrived and passed and the fact that the appellee and Mr. Jackson could return to the room at any time created exigency justifying immediate action. Additionally, the trial court found that the information supplied by the motel employee, together with the attendant circumstances, provided sufficient probable cause for issuance of the search warrant, independent of the warrantless search of Room 307 by the state police trooper. Appellee subsequently was found guilty of both charges and sentenced to a term of five to ten years imprisonment.

On appeal, the Superior Court found that, although the police entry and search of the motel room did not infringe on appellee's Fourth Amendment rights, the additional governmental intrusion into appellee's enclosed personal effects violated his constitutionally safeguarded expectations of privacy. Therefore, the Superior Court held that appellee's Fourth Amendment rights were violated by admitting the cocaine into evidence and reversed the judgment of sentence and remanded for a new trial.

The Fourth Amendment protects: "[t]he right of the people to be secure in their persons, houses, papers, and

1. 35 Pa.Stat.Ann. § 780–113 (Purdon 1977)
2. 18 Pa.Cons.Stat.Ann. § 903 (Purdon 1983)

effects, against unreasonable searches and seizures." U.S. Const. amend. IV; Pa. Const. art. 1, § 8. The protection of the Fourth Amendment does not depend on a property right in the invaded place but does depend on whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place. *Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978).

▆▆▆▆ An expectation of privacy is present when the individual, by his conduct, "exhibits an actual (subjective) expectation of privacy" and that the subjective expectation "is one that society is prepared to recognize as 'reasonable.'" *Commonwealth v. Oglialoro,* 525 Pa. 250, 256, 579 A.2d 1288, 1290–91 (1990) (quoting *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967)). The constitutional legitimacy of an expectation of privacy is not dependent on the subjective intent of the individual asserting the right but on whether the expectation is reasonable in light of all the surrounding circumstances. *Rakas,* 439 U.S. at 151–152, 99 S.Ct. at 434–35 (Powell, J., concurring). *See Hudson v. Palmer,* 468 U.S. 517, 525–526 n. 7, 104 S.Ct. 3194, 3199 n. 7, 82 L.Ed.2d 393 (1984). Additionally, a determination of whether an expectation of privacy is legitimate or reasonable entails a balancing of interests. *Hudson,* 468 U.S. at 527, 104 S.Ct. at 3200.

▆▆▆▆ The Superior Court correctly decided that while a guest in a motel or hotel room has a legitimate expectation of privacy during the period of time it is rented, no such expectation exists in the room or in any item in plain view to anyone readying the room after checkout time for the next occupant.[3]

---

**3.** Fourth Amendment protection extends to a hotel room, paid for and occupied, in much the same way as it does to a citizen's home or office. *See Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). However, courts have found premises abandoned and, consequently, privacy rights forfeited although time still remained on the rental arrangement or checkout time had not elapsed. *See United States v. Hunter,* 647 F.2d 566 (5th Cir.1981) (motel room held to be abandoned before checkout time when appellant had paid bill in full and left room with key locked inside); *United States v. Akin,* 562 F.2d 459 (7th Cir.1977) (hotel room abandoned when door was left wide open and no luggage remained in room).

*See United States v. Rahme,* 813 F.2d 31, 34–35 (2d Cir.1987); *United States v. Lee,* 700 F.2d 424, 426 (10th Cir.1983). Society is not prepared to recognize as legitimate a subjective expectation of privacy in a motel room in which the rental period has ended and the guest's right to occupancy consequently has lapsed.

■ We also agree with the Superior Court's conclusion that a motel guest has a reasonable expectation of privacy to the contents of discrete and concealed personal effects in a motel room after checkout time. The United States Supreme Court has stressed that whether a citizen's enclosed possessions are entitled to Fourth Amendment protection is not dependent on the type of hardware which secures them or the size and sophistication of the container in which they are stored. The Fourth Amendment protects alike the " 'traveler who carries a toothbrush and a few articles of clothing in a paper bag' and 'the sophisticated executive with the locked attache case.' " *United States v. Ross,* 456 U.S. 798, 822, 102 S.Ct. 2157, 2171, 72 L.Ed.2d 572 (1982).

■ While the motel personnel must have access to and use of the motel room after the rental period expires, this does not extend to items of personal luggage or other containers which do not reveal the nature of their contents. In this case, the motel management had no economic or other justification to examine the contents of the closed personal possessions of its guests, especially where only a relatively short period of time had elapsed since checkout time, appellee's car remained parked at the motel, the room remained locked, and petitioner returned shortly thereafter to register for a second night. Therefore, the search of the jacket should have been accomplished pursuant to a judicial warrant issued upon probable cause.

We find, however, the evidence is admissible under the "independent source" doctrine as set forth in *Murray v. United States,* 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472

(1988).[4]  In *Murray,* the United States Supreme Court held that evidence seized improperly could be introduced where it was established that it would have been discovered inevitably through an independent source.  In that case, federal law enforcement agents illegally forced entry into a warehouse and observed burlap bags in plain view.  These bags were later found to contain marijuana.  The agents left the warehouse without disturbing the bags and obtained a search warrant for the warehouse.  In applying for the warrant the agents did not mention the prior entry, and did not rely on any observations made during that entry.  The magistrate issued the warrant and the agents then conducted a second search of the warehouse and seized the burlap bags containing the contraband.

In assessing whether the evidence discovered during the second search could be admitted, a plurality of the Court noted that it had developed the independent source doctrine as a corollary to the exclusionary rule because:

> "[T]he interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse* position, that they would have been in if no police error or misconduct had occurred. . . .  When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation."

*Id.* at 537, 108 S.Ct. at 2533 (quoting *Nix v. Williams,* 467 U.S. 431, 443, 104 S.Ct. 2501, 2508, 81 L.Ed.2d 377 (1984)) (emphasis in original).

The Court in *Murray, supra,* determined that the ultimate question is:

> whether the search pursuant to a warrant was, in fact, a genuinely independent source of the information and tangible evidence at issue here.  This would not have been the

---

**4.**  The Superior Court did not consider *Murray v. United States* in its opinion.

case if the agents' decision to seek the warrant was prompted by what they had seen during their initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant.

*Id.* 487 U.S. at 542, 108 S.Ct. at 2536. Therefore, in determining whether the evidence is admissible under the "independent source" doctrine, the Court devised a two prong inquiry: (1) whether the decision to seek a warrant was prompted by what was seen during the initial entry; and, (2) whether the magistrate was informed at all of the information. The Court then remanded the matter to determine whether government experts would have sought the warrant if they had not earlier entered the site.

In the present case, the record reflects sufficient evidence, other than the white powder, upon which the police would have decided to seek and did seek the warrant.[5] Trooper Bopp, in his affidavit, considered the diagram of the hotel lobby, Mrs. Sheffield's statement that she thought she observed residue in the baggies, the fact that the baggies are used to package and sell drugs, and the fact that the police were investigating a prior robbery.

The record also reflects that the magistrate only considered the above facts in his determination that probable cause existed to issue the warrant. Because no evidence concerning the cocaine in the clothing was presented to the magistrate, the cocaine would have been discovered by a source independent of the initial illegality.

We hold, therefore, that both prongs of the test set forth in *Murray* have been met and the evidence in the present case is admissible under the "independent source" doctrine. To hold otherwise would be contrary to the purpose of the exclusionary rule, for it would put the police in a worse position than

5. While the record reflects that the decision to seek the warrant occurred after the field testing of the white substance, it appears that the clear intent of *Murray, supra,* is to require that there be no causal connection between the illegal discovery and the decision to seek the warrant.

they would have occupied if no violation had occurred. Accordingly, the order of the Superior Court is reversed.

ZAPPALA and CAPPY, JJ., file dissenting opinions.

ZAPPALA, Justice, dissenting.

I dissent and would affirm on the basis of the opinion of the Superior Court.

CAPPY, Justice, dissenting.

I dissent. I would affirm on the basis of the opinion of the learned Superior Court.