J-S35036-17

2017 PA Super 183

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DION JERRY WILLIAMS | : | No. 1845 WDA 2016 |

Appeal from the Order Entered November 17, 2016
In the Court of Common Pleas of Erie County
Criminal Division at No(s):  CP-25-CR-0002101-2016

BEFORE:   LAZARUS, RANSOM, JJ., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.:                          **FILED JUNE 13, 2017**

Appellant, the Commonwealth of Pennsylvania, appeals from the November 17, 2016, order granting the pre-trial suppression motion filed by Appellee, Dion Jerry Williams.[1]  Following our careful review of the record and the law, we reverse the suppression order and remand for further proceedings consistent with this decision.

---

[1] The Commonwealth may appeal an interlocutory order suppressing evidence where, as here, the Commonwealth provides a certification within its notice of appeal that the order terminates or substantially handicaps the prosecution. **Commonwealth v. Whitlock**, 69 A.3d 635, 636 n.2 (Pa.Super. 2013); Pa.R.A.P. 311(d).

[*] Former Justice specially assigned to the Superior Court.

Appellee was charged with three counts of possession with the intent to deliver a controlled substance ("PWID"), one count of possession of drug paraphernalia, and two counts of possession of a controlled substance.[2] On September 22, 2016, with the assistance of counsel, he filed an omnibus pre-trial motion seeking to suppress physical evidence seized by the police. On October 6, 2016, the matter proceeded to a suppression hearing, at which the Commonwealth presented the testimony of Erie Police Officers Steven Deluca, Ira Bush, and Jason Russell.[3]

Specifically, Officer Steven Deluca, who is a seventeen year veteran of the Erie Police Department, testified that, on March 18, 2016, at approximately 11:00 p.m., he responded to a 911 call for a shooting at 1016 West 4th Street. N.T., 10/6/16, at 5. Upon arrival, he noticed there was "blood all over the sidewalk leading up to the side of [the] residence." *Id.* at 6. Officer Deluca followed the blood trail, discovering a dead pit bull, which had been shot numerous times, lying in the backyard, and blood "everywhere," including outside the entry of the first floor apartment. *Id.* at 15-16. Officer Deluca proceeded to the second floor apartment and discovered a white male, who had been shot in the leg and face. *Id.* at 6. Officer Deluca and other responding police units checked the second floor

---

[2] 35 P.S. §§ 780-113(a)(30), (32), and (16), respectively.

[3] The defense offered no witnesses.

apartment and surrounding backyard for other victims, as well as the shooter, and after finding neither, interviewed the neighbors. *Id.*

A neighbor informed Officer Deluca that Appellee lived in the first floor apartment, and he saw one of Appellee's vehicles, a gray BMW, leaving the area at about the time of the shooting. *Id.* at 7-8. Officer Deluca looked in the windows of the first floor apartment and discovered that no one was home; he was then advised that the other vehicle associated with Appellee's apartment was gone. *Id.* at 9. Officer Deluca passed on the information to other patrol officers, and Appellee's gray BMW was later stopped by Officer Russell. *Id.*

Appellee informed Officer Russell that he was staying at the Knights Inn with a male friend because of ongoing domestic issues with his girlfriend. *Id.* at 10. The Knights Inn is "just blocks from the shooting and traffic stop" locations. *See* Trial Court Opinion, filed 11/17/16, at 2. Appellee showed the officer a key card, indicated it was for room 111 of the Knights Inn, and informed the officer that he was in the room at the time of the shooting. N.T., 10/6/16, at 10.

Based on this information, which was relayed to Officer Deluca, at approximately 12:30 a.m. on March 19, 2016, Officer Deluca went to room 111 of the Knights Inn, "banged on the door," and said, "Erie police. Come out. We need to talk to you." *Id.* No one responded to Officer Deluca's

knocking and announcing, so he tried the key card, which did not open room 111. *Id.* at 11.

Officer Deluca proceeded to the front desk and was advised by the manager that the key card, which had been in Appellee's possession, was not for room 111. *Id.* The manager, who scanned the key card, indicated the key card was for room 231; however, the registry information related to the room "was missing or misplaced or never existed" such that the manager could not tell the officer who had rented or was occupying the room. *Id.* In comparison to room 111, room 231 was on the "complete opposite side of the motel, the second floor versus the first floor." *Id.* at 21. Believing that another victim from the shooting might be in room 231, Officer Deluca proceeded to the room. *Id.* at 12, 21.

Officer Deluca knocked and announced his presence at room 231, but there was no response. *Id.* Accordingly, he used the key card and opened the door to room 231, at which time he smelled a strong odor of marijuana and observed in plain view a duffle bag with money sticking out of it, a clear Mason jar of marijuana, and a white powdery substance. *Id.* He did a quick, three second sweep of the room for people, retreated from the room empty-handed, telephoned the district attorney's office, and requested a search warrant for the room. *Id.* at 13. A search warrant was secured and executed upon the room. *Id.* at 14.

On cross-examination, Officer Deluca clarified that, from the time he arrived at the Knights Inn until he opened room 231, approximately ten minutes had elapsed. *Id.* at 22. Officer Deluca admitted that, during this time, Appellee was in police custody; however, based on the address of the shooting, the description of Appellee's vehicle fleeing the scene, and "the totality of everything that was known to [him] at that exact time," he believed an injured victim or participant was in the Knights Inn room. *Id.* at 23.

Officer Deluca indicated that he requested Knights Inn employees gain access to the hotel's surveillance tapes before he entered room 231, but the employees were unable to do so. *Id.* at 24. He testified that he did not wait for a warrant at this point because "the exigent circumstance of going into that room was more prevalent than waiting for a warrant[.]" *Id.*

Police Officer Ira Bush, a thirteen year veteran of the Erie Police Department, testified that he also responded to the 911 call for the shooting at issue. *Id.* at 27. He noticed "blood all over the place[,]" a dog dying the backyard, and a man who had been shot in the face. *Id.* at 27-28. He looked in the windows of the first floor apartment and noticed it appeared as if the apartment had been vacated quickly with phone chargers and a ketchup bottle strewn about the floor. *Id.* at 28. Neighbors informed Officer Bush that Appellee, who lived in the first floor apartment, was "a drug dealer." *Id.* at 29. Officer Bush heard over the police radio that a

neighbor informed the police that a vehicle fitting the description of Appellee's vehicle was seen "speeding away" from the scene "right after" the shooting. *Id.* at 35-36, 41.

Officer Bush testified he responded to the Knights Inn with Officer Deluca and confirmed that the police spoke to the desk manager after the key card at issue did not open room 111. *Id.* at 38. He testified the desk manager scanned the key card and told the police the key card would open room 231 but not room 111. *Id.* at 39. The manager indicated that the hotel had no record or information as to who had rented the room; however, only one key card had been issued for the room. *Id.* at 30, 38-39. Further, the manager could not access the video surveillance system.

Officer Jason Russell testified that he also responded to the 911 call for the shooting, and upon arrival, he observed the gunshot victim, one or two dead animals in the backyard, an "extensive amount of blood, and what appeared to be two separate types of projectiles, both slug rounds[.]" *Id.* at 45. Officer Russell indicated that neighbors informed the police that a vehicle matching Appellee's gray sedan was seen leaving the area without its headlights activated "shortly after the shots had been fired[.]" *Id.*

Officer Russell patrolled the surrounding area in his vehicle, and within an hour of receiving the information about the vehicle, he saw a gray BMW sedan "traveling at a high rate of speed at 7th and Sassafras, westbound." *Id.* at 47. He ran the registration for the vehicle and discovered it was

registered to Appellee. *Id.* Accordingly, he initiated a stop of the vehicle at 11:45 p.m. *Id.* at 48, 59.

Officer Russell discovered Appellee driving the vehicle with a male passenger. Officer Russell testified that the following transpired:

> Basically in the roadside conversation [Appellee] indicated that he was aware there had been a shooting at his residence and that he was actually, in fact, headed towards the residence at that time. He indicated that at the time of the shooting he had been at the Knights Inn hotel on West 10th Street. He specifically stated that he had been in room 111, opened his wallet, and displayed a key card for the hotel room as kind of proof that that was where he was coming from.
>
> ***
>
> [Appellee] said he had been in an argument with his fiancée and that he had gone to the Knights Inn to create some distance, that he had rented a room to get away from that situation.

*Id.* at 48-49.

Officer Russell removed Appellee, as well as the passenger from the vehicle, and conducted a pat-down; the officer seized a stolen nine millimeter pistol from the passenger. *Id.* at 49. Appellee had no weapons on his person. *Id.* Appellee and his passenger were placed in separate police cruisers, and the police did a "cursory sweep of [Appellee's] vehicle to ensure there were no additional weapons." *Id.* at 50. Officer Russell indicated that "[a]t this point we found that [Appellee] had taken the hotel key card from his wallet and discarded it in the vehicle. It was found dropped between the driver's side seat and center console of the vehicle." *Id.* Officer Russell seized the key card. *Id.*

- 7 -

Officer Russell testified that, on the way to the police station, the following transpired:

> [Appellee] appeared nervous. He spoke quite a bit, made several unsolicited utterances, the fact that he knows that the individual shot was an upstairs neighbor, he was a good guy, continually asked how he was doing, what his status was, and also kind of reiterated that he had been at this Knights Inn room 111 with an individual that he referred to as Todd.

*Id.* at 51.

Officer Russell asked other officers to meet him at the police station, and he gave them the following information:

> I provided [the officers] with the information that [Appellee] had indicated he had been at room 111 with another unknown individual only known as Todd, that he had attempted to discard the key, and that [the police] were going to be speaking with him in regard to the shooting.
>
> So at that point I believe they were going to identify any additional suspects, victims, or information that may be relevant to room 111.

*Id.* at 52.

On cross-examination, Officer Russell confirmed that he saw neither blood nor bullet holes in Appellee's vehicle. *Id.* at 54. He also confirmed that he requested other officers proceed to the Knights Inn to determine whether there were any additional victims, witnesses, or actors in connection with the shooting. *Id.* at 55. Officer Russell indicated that the entry into room 231 occurred at approximately 12:30 a.m., and the subsequent warrant was executed at approximately 1:00 a.m. *Id.* at 58. Appellee was in police custody during this time. *Id.*

At the conclusion of the testimony, defense counsel indicated that Appellee was not challenging the stop and search of his vehicle; however, Appellee was challenging the police's search of room 231 of the Knights Inn without a search warrant. *Id.* at 60-61. The Commonwealth responded that, under the circumstances of the case, Appellee failed to prove he had a legitimate expectation of privacy in room 231. The Commonwealth further argued that, assuming Appellee had a legitimate expectation of privacy, the entry of room 231 was justified under either the exigent circumstances or protective sweep exceptions to the warrant requirement. *Id.* at 66-84.

By order and opinion entered on November 17, 2016, the trial court granted Appellee's pre-trial suppression motion on the basis the police improperly entered room 231 of the Knights Inn absent a warrant. Specifically, the trial court found Appellee had a legitimate, reasonable expectation of privacy in room 231, and the police's entry into the room was not justified based on either the exigent circumstances or protective sweep exceptions to the warrant requirement. Consequently, although the contraband was clearly visible when the police entered room 231, the trial court found that the police did not view it from a lawful vantage point. On December 5, 2016, the Commonwealth filed a notice of appeal to this Court, and all Pa.R.A.P. 1925 requirements have been met.

On appeal, the Commonwealth avers the lower court erred in granting Appellee's suppression motion. Specifically, the Commonwealth argues

Appellee failed to prove that he had a legitimate expectation of privacy in room 231 of the Knights Inn. For the reasons discussed in detail *infra*, we agree with the Commonwealth that Appellee failed to demonstrate he had a legitimate expectation of privacy in room 231 of the Knights Inn, and therefore, the suppression court erred in granting Appellee's motion to suppress the physical evidence seized therefrom.[4]

Our standard of review of a lower court's order granting a defendant/appellee's motion to suppress evidence is well established:

> When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts. **Commonwealth v. Miller**, 56 A.3d 1276, 1278–79 (Pa.Super. 2012) (citations omitted). "Our standard of review is restricted to establishing whether the record supports the suppression court's factual findings; however, we maintain *de novo* review over the suppression court's legal conclusions." **Commonwealth v. Brown**, 606 Pa. 198, 996 A.2d 473, 476 (2010) (citation omitted).

---

[4] The Commonwealth further argues that the police were justified in entering the hotel room pursuant to the exigent circumstances exception to the warrant requirement. However, in light of our conclusion that Appellee failed to demonstrate a reasonable expectation of privacy, we need not address the Commonwealth's alternate argument. **See Commonwealth v. Enimpah**, 630 Pa. 357, 106 A.3d 695, 702 (2014) ("[I]f the evidence shows there was no privacy interest, the Commonwealth need prove no more; in terms of the court's review, it need go no further if it finds the defendant has not proven a reasonable expectation of privacy.").

***Commonwealth v. Korn***, 139 A.3d 249, 252-53 (Pa.Super. 2016).

"Here, as noted *supra*, Appellee presented no witnesses, and the Commonwealth presented [three]. Therefore, the Commonwealth's evidence is uncontradicted." ***Commonwealth v. Petty***, 1739 EDA 2016, 2017 WL 943259, *2 (Pa.Super. filed 3/10/17) (citing ***Commonwealth v. Smith***, 979 A.2d 913, 917–18 (Pa.Super. 2009) (The "Commonwealth's evidence is essentially uncontradicted" because the defense did not present any witnesses at the suppression hearing.)).

> The Fourth Amendment protects: "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; Pa. Const. art. 1, § 8. The protection of the Fourth Amendment does not depend on a property right in the invaded place but does depend on whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place.

***Commonwealth v. Brundidge***, 533 Pa. 167, 620 A.2d 1115, 1118 (1993) (citation omitted).

Although Appellee was charged with a possessory offense, and as such has automatic standing to challenge the suppression of the items seized, it was appropriate for the suppression court to examine the question of Appellee's privacy interest in the place searched (room 231 of the Knights Inn). ***See Enimpah***, *supra*. It is well-settled that:

> An expectation of privacy will be found to exist when the individual exhibits an actual or subjective expectation of privacy and that expectation is one that society is prepared to recognize as reasonable. In determining whether a person's expectation of

- 11 -

privacy is legitimate or reasonable, the totality of the circumstances must be considered and the determination will ultimately rest upon a balancing of the societal interests involved. "The constitutional legitimacy of an expectation of privacy is not dependent on the subjective intent of the individual asserting the right but on whether the expectation is reasonable in light of all the surrounding circumstances."

*Commonwealth v. Viall*, 890 A.2d 419, 421–22 (Pa.Super. 2005) (citations and quotation omitted). Further, our Supreme Court has emphasized that it is a *defendant's* burden to prove that he has both a subjective expectation of privacy and that the subjective expectation is one which society is willing to respect as legitimate. *Commonwealth v. Millner*, 585 Pa. 237, 888 A.2d 680 (2005).

Pennsylvania jurisprudence recognizes that "[a] hotel room can [ ] be the object of Fourth Amendment protection as much as a home or an office." *Commonwealth v. Dean*, 940 A.2d 514, 519 (Pa.Super. 2008) (quotation marks, quotation, and citation omitted). In this vein, our Supreme Court has held that a registered hotel guest enjoys a legitimate expectation of privacy in a hotel room during the period of time in which the room rental remains valid. *Brundidge*, *supra*. However, that expectation does not exist in the room or in any item in plain view to anyone after checkout time, after the rental period has ended, and/or after the guest's right to occupancy has lapsed. *Id.* at 173, 620 A.2d at 1118.

In the case *sub judice*, the uncontradicted evidence presented at the suppression hearing reveals Appellee informed Officer Russell that he was

- 12 -

staying at the Knights Inn with a male friend. He pulled a key card out of his wallet, displayed it to the officer, and specifically indicated he was staying in room 111. However, when Officer Russell's attention was diverted elsewhere, Appellee placed the key card between the driver's side seat and center console of his vehicle. Officer Russell discovered the key card during a search of Appellee's vehicle and seized it.

As he was being transported to the police station, Appellee reiterated that, at the time of the shooting, he was in room 111 of the Knights Inn with a male friend. Subsequently, at the Knights Inn, it became clear to the police that the key card, which had been in Appellee's possession, was not issued in connection with room 111; however, the key card was issued in connection with room 231. As the registry information for room 231 "was missing or misplaced or never existed," N.T., 10/6/16, at 11, the manager of the hotel was unable to provide information as to who had rented or was occupying room 231. Further, the manager did not have access to the surveillance cameras. However, the manager indicated that the key card was the sole key issued for the room.

Based upon this evidence, we agree with the Commonwealth that Appellee failed to demonstrate a subjective expectation of privacy in room 231 of the Knights Inn, much less one that society would accept as reasonable. Appellee produced no evidence at the suppression hearing indicating that he was a hotel guest of room 231. That is, he presented no

evidence that he was properly occupying room 231, let alone that he had rented the room and, if so, for what period of time.

Moreover, the Commonwealth's evidence, upon which Appellee relied to prove that he had an expectation of privacy, does not demonstrate that Appellee was a registered hotel guest of room 231 at the time of the police's entry into the room. **See Brundidge**, **supra**. At most, the Commonwealth's evidence demonstrated that Appellee was in possession of the key card for room 231. However, inasmuch as the manager was unable to produce a registry or any information as to who had rented or was occupying room 231, and thus how Appellee came to be in possession of the key card, we conclude this evidence alone does not establish Appellee's personal privacy interest in room 231. Further, Appellee never claimed to the police that he was occupying or a guest of room 231; but rather, Appellee repeatedly informed the police that he was a guest of room 111 of the Knights Inn.

Finally, it bears mentioning that the trial court's ruling that Appellee had a legitimate expectation of privacy was based, in part, on the court's findings that Appellee lied to the police about which room he was occupying at the Knights Inn, as well as the fact he attempted to hide the key card in his vehicle. The trial court reasoned that Appellee was actually attempting to protect his "privacy" in the room, as well as the illegal contraband contained therein, through his subterfuge. N.T., 10/6/16, at 62. However, our Supreme Court has held that "[a] defendant's attempt to secrete

- 14 -

evidence of a crime is not synonymous with a legally cognizable expectation of privacy. A mere hope for secrecy is not a legally protected expectation." ***Millner***, 585 Pa. at 257-58, 888 A.2d at 692 (quotation marks and quotation omitted). Thus, we specifically reject the trial court's analysis that Appellee's conduct through subterfuge constitutes a legitimate, reasonable expectation of privacy. ***See id.***

In short, Appellee failed to establish a subjective and reasonable expectation of privacy in the particular hotel room at issue. Accordingly, in such circumstances, there was no need for the Commonwealth to establish the lawfulness of the police entry into the hotel room and the seizure of the contraband therefrom. Thus, there was no basis upon which the lower court could properly order its suppression.

Reversed; Remanded; Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/13/2017

- 15 -