J-A26041-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| JAMEL SWANN | : | No. 987 EDA 2020 |

Appeal from the Order Entered March 4, 2020
In the Court of Common Pleas of Delaware County Criminal Division at
No(s): CP-23-CR-0004873-2019

BEFORE: BENDER, P.J.E., LAZARUS, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.: **FILED OCTOBER 15, 2020**

Appellant, the Commonwealth of Pennsylvania, appeals from the March 4, 2020, order entered in the Court of Common Pleas of Delaware County, which granted the pre-trial suppression motion filed by Appellee, Jamel Swann.[1] Following a careful review, we reverse and remand for further proceedings.

---

* Former Justice specially assigned to the Superior Court.

[1] "The Commonwealth may appeal an interlocutory order suppressing evidence where, as here, the Commonwealth provides a certification with its notice of appeal that the order terminates or substantially handicaps the prosecution." **See Commonwealth v. Williams**, 165 A.3d 994, 995 n.1 (Pa.Super. 2017) (citing Pa.R.A.P. 311(d)) (other citation omitted).

The relevant facts and procedural history are as follows: Appellee was arrested and charged with various firearm and drug offenses, as well as terroristic threats and simple assault.[2]  On December 4, 2019, Appellee filed a counseled omnibus pre-trial motion seeking to suppress the evidence seized by the police on May 18, 2019, from Appellee's hotel room, which was Room 228 of the Summit Motor Inn in Upper Darby Township.  *See* Appellee's Omnibus Pre-Trial Motion, filed 12/4/19, at 5.  Appellee averred the evidence was the product of an unreasonable search and seizure.  Specifically, Appellee averred the police improperly entered Appellee's hotel room (Room 228) absent a warrant and without probable cause or exigent circumstances.  *See id.* at 5-7.

On March 3, 2020, the Commonwealth filed a response to Appellee's pre-trial suppression motion.  Therein, the Commonwealth averred the police had probable cause, and exigent circumstances existed permitting them to enter Room 228 without a warrant. On January 21, 2020, the matter proceeded to a suppression hearing.  The defense offered no witnesses while

---

[2] Specifically, Appellee was charged with possession of firearm prohibited, 18 Pa.C.S.A. § 6105(a)(1), firearms not to be carried without a license, 18 Pa.C.S.A. § 6106(a)(1), terroristic threats, 18 Pa.C.S.A. § 2706(a)(1), possession of weapon, 18 Pa.C.S.A. § 907(b), simple assault, 18 Pa.C.S.A. § 2701(a)(3), two counts of possession of a controlled substance, 35 P.S. 780-113(a)(16), possession of marijuana for personal use, 35 P.S. § 780-113(a)(31)(i), possession of drug paraphernalia, 35 P.S. § 780-113(a)(32), and possession of an instrument of crime, 18 Pa.C.S.A. § 907(a).

the Commonwealth offered the testimony of Upper Darby Township Police Officers Francis Devine and Michael DeHoratius.[3]

Specifically, Officer Devine, who has been an officer since 2008, testified he was in full uniform at roll call on May 18, 2019, when at approximately 6:00 a.m., the police "received a call from a female who stated she was being held against her will by a man with a gun in Room 331 of the Summit Motor Inn[.]" N.T., 1/21/20, at 5-6. Within minutes, Officer Devine and several of his fellow officers, including Officer DeHoratius, arrived at the hotel, made contact with the hotel manager, and proceeded up the stairs to the room. *Id.* at 6-7.

Officer Devine testified the police knocked on the door announcing their presence, and a female opened the door a "crack" to see who was outside. *Id.* at 8. He testified the female appeared to be excited that it was the police, and after removing a chair that had been propped up against the door as an apparent barricade, the female permitted the police to enter the room. *Id.*

Officer Devine noticed a male and another female hanging outside of a window onto a balcony or ledge beneath the window, and the police pulled them back into the room. *Id.* The duo reported they were trying to climb out

---

[3] The suppression court specifically found the testimony of Officers DeHoratius and Devine to be credible. Suppression Court Order and Opinion, filed 3/4/20, at 4.

of the window and drop about thirty feet to the ground because they thought a man with a gun was at the door. *Id.*

Officer Devine indicated the officers interviewed the three occupants of Room 331, as well as employees of the hotel. *Id.* at 9. Specifically, while Officer Devine's fellow officer, Officer DeHoratius, interviewed the three occupants of Room 331, Officer Devine spoke with the hotel manager. *Id.* at 27.

The manager informed Officer Devine that the employees who had worked the overnight shift had problems with a male roaming the hallways and approaching hotel patrons in "an aggressive confrontational manner." *Id.* at 10. The description of this male matched the description of the male, who had apparently threatened one or more of the occupants of Room 331. *Id.* The overnight shift hotel employees were so concerned that they informed the manager "of where [the male] was located, what he was wearing, and his behavior that went on the night before." *Id.* Specifically, the employees told the manager, who in turn told the police, that the man in question could be found in Room 228. *Id.*

Officer Devine testified that, given all of the information provided to him, he "had a legitimate concern that there may be potential victims being held against their will at gunpoint in Room 228." *Id.* at 11. Accordingly, Officer Devine took a key, which he received from the hotel manager, proceeded to Room 228, and opened the door. *Id.* Inside, he saw a black male, later

identified as Appellee, lying on the bed. *Id.* at 12. Officer Devine remained in the hall and ordered Appellee to exit the room. *Id.* As Appellee got off of the bed, Officer Devine observed a black firearm and a pile of drug paraphernalia on the bed next to where Appellee had been lying. *Id.*

Officer Devine testified the police escorted Appellee to a common area in the hallway, and the three occupants of Room 331 positively identified Appellee. *Id.* Officer Devine indicated the occupants appeared to be scared because they would not come into the common area; but rather, they "peeked their heads around [the] corner" to view Appellee. *Id.* at 13.

On cross-examination, Officer Devine confirmed that, while he was speaking with the hotel employees and management, Officer DeHoratius was speaking with the occupants of Room 331. *Id.* at 27. Officer Devine explained:

> [S]o again I arrive on location. We made contact with the night manager. We also made contact with three individuals. The night manager tells me himself as well as tells me that his previous shift had told him about a black male fitting the description that the victim and the witnesses also described that is confrontational, approaching people, causing issues all night long to the point where he is made aware of it. He was present when we went to Room 331. And he advises us that the male and that the victim and the witnesses were describing matched the male that was described to him that was being confrontational and approaching other people. He tells us he is in Room 228. I leave to go to the other side of the hotel while Sergeant DeHoratius stays on location and has his conversation with the victim and the two witnesses. Okay, so we are on two separate sides of the building. He relays to me over the radio that there is a concern and that we should probably look into Room 228. After hearing what the manager said, after the manager telling me that previous people that were employed there before were concerned as well, an officer I work

- 5 -

with on a daily basis who is having a more descriptive conversation than I was present for, after having walked into a room and seen people hanging out of a window, that is when I deducted that maybe there could be possibl[y] other victims and we should possibly go in there to make sure everybody is okay.

*Id.* at 28.

Officer Devine clarified that, prior to opening the door to Room 228, Officer DeHoratius stated on the radio that there might be other victims, including ones being held in Room 228. *Id.* at 29-30. Officer Devine could not state with certainty whether he had already secured the key for Room 228 and was on his way to Room 228, or if he had not yet done so prior to receiving this information from Officer DeHoratius. *Id.* at 31. He testified that the events were unfolding quickly and simultaneously. *Id.* However, he stated with certainty that he did not open the door to Room 228 until after Officer DeHoratius stated on the radio that there might be other victims in Room 228. *Id.*

Officer Devine admitted he did not knock and announce prior to opening the door of Room 228 with the key. *Id.* He explained he did not enter the room after he opened the door, but he ordered Appellee to exit the room, at which time he saw the gun and drug paraphernalia on the bed. *Id.* at 32. He testified he never entered Room 228, but other officers seized contraband, including a gun, drug paraphernalia, and controlled substances from the bed. *Id.*

Officer DeHoratius, a sixteen year veteran of the police force, testified he was also in uniform and at roll call on May 18, 2019, when the police received a dispatch at approximately 6:00 a.m. indicating "a subject with a gun at the Summit Motor Inn. The information provided was that a female was being held against her will at gunpoint." *Id.* at 41. He clarified the caller indicated she was in Room 331. *Id.* at 42.

Officer DeHoratius testified he and several officers immediately proceeded to the scene and went to Room 331. *Id.* Initially, when the police knocked on the door, no one answered, and, therefore, Officer DeHoratius called the dispatcher, who in turn contacted the caller to inform her the police were at the door. *Id.* Officer DeHoratius confirmed that, after the female opened the door and the police entered the room, two people, including Jared Dill, were outside a window standing on a small ledge. *Id.* at 43. The police confirmed the gunman was not inside of the room and questioned the three occupants. *Id.*

Mr. Dill informed Officer DeHoratius that he had been threatened with a gun by a black male with a muscular build wearing a black tee-shirt and black sweatpants. *Id.* This man, later identified as Appellee, was in Room 228. *Id.* at 47. Mr. Dill told the officer he initially had contact with Appellee in the lobby, and Mr. Dill loaned him his cell phone charger. *Id.* at 44. Later in the night, Mr. Dill went to Appellee's room to retrieve his cell phone charger; however, Appellee "took a gun off the bed [and] walked towards him." *Id.*

Mr. Dill reported to the officer that Appellee threatened to shoot Mr. Dill, and as Appellee was taking the safety off of the gun, Mr. Dill ran out of Appellee's room. *Id.* He told Officer DeHoratius that he believed Appellee was going to shoot him. *Id.* at 45. Officer DeHoratius confirmed Mr. Dill told him that these events did not occur in Room 331, but in Appellee's room. *Id.* at 44.

Officer DeHoratius immediately broadcasted the information he received from Mr. Dill to his fellow officers and provided a description of Appellee. *Id.* Officer DeHoratius confirmed Officer Devine would have received his broadcast. *Id.* He testified that, based on all of the information provided to the police, it was the officers' belief that the man who had threatened Mr. Dill was still somewhere in the hotel armed with a gun and, more specifically, the officers believed the man was in Room 228. *Id.* at 46, 49.

Officer DeHoratius confirmed that, after Appellee was taken into custody, Mr. Dill and the two female occupants of Room 331 positively identified Appellee.[4] *Id.* at 47.

On cross-examination, Officer DeHoratius admitted the police did not check "to see who was registered to Room 228[.]" *Id.* at 49-50. He also admitted that, soon after arriving at Room 331, the police determined no one was being held against their will or possessed a gun in that specific room. *Id.*

---

[4] The two female occupants of Room 331 told the officers they recognized Appellee from the lobby; however, they were not present when Appellee allegedly drew a gun on Mr. Dill in Room 228. *Id.* at 56.

at 50. Moreover, Officer DeHoratius admitted that all three occupants of Room 331, who were in a "state of panic," were in the room when the police arrived. *Id.* at 50, 54. However, he testified the police had reason to believe the armed gunman was still at the hotel and could be holding victims beyond those occupying Room 331. *Id.* at 51.

Based on the aforementioned, the suppression court granted Appellee's motion to suppress the physical evidence seized by the police from Room 228. Specifically, while the suppression court found the officers' testimony to be credible, the court concluded the testimony did not support the legal conclusion that the police had probable cause to enter Room 228. Suppression Court Order and Opinion, filed 3/4/20, at 4-5. In this vein, the suppression court relevantly held the following:

> At the time that Officer Devine made the decision to make the intrusion into Room 228 without a warrant, the information that he possessed did not rise to the level of probable cause. That information, from what [the suppression] can decipher from the testimony, may have amounted to reasonable suspicion, at best. It is entirely unclear what occurred in Room 331. What is clear is that there was no woman, no man, being held against their will; the [*sic*] was no gunman in the room; the description of a black, muscular male is vague; there [*sic*] information provided that multiple hours before the dispatch was received, there was a black man annoying patrons does not help justify the warrantless search. That information is too far attenuated from the situation to conclude that the man who was allegedly holding the occupants of Room 311 hostage was also the man staying in Room 228, and that the man staying in Room 228 had hostages with him. It is not clear from the testimony whether or not Officer Devine knew the story of the phone charger situation at the time he entered Room 228. There was no testimony that the situation was radioed to him; only that Room 228 may be where this alleged gunman was staying. However, even if Officer Devine knew the story Mr.

- 9 -

Dill was telling Officer DeHoratius, there is no reasonable jump to conclude that the male in Room 228 was holding people hostage; the people having an issue with the male in Room 228 were all inside of Room 331 when police arrived.

Suppression Court Order and Opinion, filed 3/4/20, at 5.

Moreover, the suppression court summarily held that "[w]ithout the existence of probable cause, exigent circumstances standing alone cannot justify a warrantless entry into Room 228. However, even assuming probable cause existed, the exigent circumstance factors do not weigh in the favor of the Commonwealth."[5] *Id.* at 5.

On March 5, 2020, the Commonwealth filed a motion for reconsideration. On March 11, 2020, the suppression court denied the motion for reconsideration, and the Commonwealth filed a notice of appeal to this Court on April 2, 2020. The trial court did not order the Commonwealth to file a Pa.R.A.P. 1925(b) statement, and consequently, the Commonwealth did not file such a statement. The suppression court filed a brief opinion on April 20, 2020, referring this Court to its earlier opinion.

---

[5] While the suppression court set forth the factors used in determining whether exigent circumstances exist, *id.* at 5, the suppression court did not analyze these factors specifically as it relates to the instant matter.

Moreover, we note that in his pre-trial suppression motion Appellee sought to suppress the pre-trial identifications made by the three occupants of Room 331 based on the theories the identifications were fruit of the poisonous tree and/or unduly suggestive. The suppression court concluded the identifications were fruit of the poisonous tree, and therefore, the court declined to make factual findings or rule on Appellee's claim the identifications were unduly suggestive.

Initially, we note:

> When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the …record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts. *Commonwealth v. Miller*, 56 A.3d 1276, 1278–79 (Pa.Super. 2012) (citations omitted). "Our standard of review is restricted to establishing whether the record supports the suppression court's factual findings; however, we maintain *de novo* review over the suppression court's legal conclusions." *Commonwealth v. Brown*, 606 Pa. 198, 996 A.2d 473, 476 (2010) (citation omitted).

*Commonwealth v. Korn*, 139 A.3d 249, 252–53 (Pa.Super. 2016).

"It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." *Commonwealth v. Gallagher*, 896 A.2d 583, 585 (Pa.Super. 2006). Moreover, our scope of review from a suppression ruling is limited to the evidentiary record that was created at the suppression hearing. *In re L.J.*, 622 Pa. 126, 79 A.3d 1073, 1087 (2013).

"Both the Fourth Amendment of the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution guarantee individuals freedom from unreasonable searches and seizures." *Commonwealth v. Bostick*, 958 A.2d 543, 550 (Pa.Super. 2008) (quotation marks and quotation omitted). "[W]arrantless searches and seizures are…unreasonable per se, unless conducted pursuant to a specifically established and well-delineated

exception to the warrant requirement." *Id.* at 556. One exception to the warrant requirement is when probable cause and exigent circumstances are present. "Absent probable cause and exigent circumstances, warrantless searches and seizures in a private home violate both the Fourth Amendment [of the United States Constitution] and Article I[,] § 8 of the Pennsylvania Constitution." *Commonwealth v. Bowmaster*, 101 A.3d 789, 792 (Pa.Super. 2014) (citation omitted). These constitutional protections have been extended to include a person's hotel room.[6] *See Commonwealth v. Dean*, 940 A.2d 514, 521 (Pa.Super. 2008) (stating "[w]arrantless searches and seizures inside a…hotel room are presumptively unreasonable unless the occupant consents or probable cause and exigent circumstances exist to justify intrusion") (citations and parentheses omitted)). Thus, prior to the police making a warrantless entry into the hotel room in the instant case, the police needed (1) probable cause and (2) exigent circumstances.

The Commonwealth initially contends the suppression court erred in concluding the police did not have probable cause to enter Room 228.

> The well-established standard for evaluating whether probable cause exists is the "totality of the circumstances" test.

---

[6] We shall assume, *arguendo*, Appellee established that he had a legitimate expectation of privacy in the hotel room (Room 228). *See Commonwealth v. Enimpah*, 630 Pa. 357, 106 A.3d 695, 702 (2014) (holding that although a defendant charged with a possessory offense has automatic standing to challenge the suppression of the items seized, he must additionally demonstrate that he had a reasonable expectation of privacy in the place searched).

This test allows for a flexible, common-sense approach to all circumstances presented. Probable cause typically exists where the facts and circumstances within the officer's knowledge are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed. The evidence required to establish probable cause for a warrantless search must be more than a mere suspicion or a good faith belief on the part of the police officer.

*Commonwealth v. Runyan*, 160 A.3d 831, 837 (Pa.Super. 2017) (citation omitted). "[W]hen we examine a particular situation to determine if probable cause exists, we consider all the factors and their total effect, and do not concentrate on each individual elements. We also focus on the circumstances as seen through the eyes of the trained officer…." *Commonwealth v. Ford*, 175 A.3d 985, 990 (Pa.Super. 2017) (quotation marks and quotation omitted). "The question we ask is not whether the officer's belief was correct or more likely true than false. Rather, we require only a probability, and not a *prima facie* showing, of criminal activity." *Id.* (citation omitted) (bold omitted).

In the case *sub judice*, we conclude that, given the totality of the circumstances, the police had probable cause to believe that an offense was and/or was being committed, and the person committing the offense was in Room 228. For instance, there is no dispute that, on May 18, 2019, at approximately 6:00 a.m., the police received a dispatch for a female being held at gunpoint against her will at the Summit Motor Inn. The caller indicated she was in Room 331, and accordingly, the police immediately proceeded to the room upon arrival at the hotel. Inside of Room 331, the police discovered

three occupants, all of whom appeared to be in a state of panic. In fact, two of the occupants had climbed out of a third story window and were standing on a ledge in an apparent attempt to flee the room.

The police questioned the occupants and discovered that, during the night, the male occupant of Room 331, Mr. Dill, had been threatened in Room 228 by a black male with a muscular build wearing a black tee-shirt and black sweatpants. Specifically, Mr. Dill informed the police that, earlier in the evening, the male had borrowed a cell phone charger from Mr. Dill and, when he did not return it, Mr. Dill went to the male's room only to be threatened with a gun. Mr. Dill escaped the room and fled back to Room 331 when the male released the safety on the firearm.

In addition to this information, the police were informed by the hotel manager that, during that same evening, the male in Room 228, who matched the general description provided by Mr. Dill, had approached other hotel patrons in "an aggressive confrontational manner." N.T., 1/21/20, at 10.

Based on the totality of the circumstances, we conclude the facts and circumstances within the officers' knowledge were sufficient to warrant a person of reasonable caution to believe that an offense had been or was being committed in Room 228. **See Runyan**, **supra** (setting forth probable cause standard). Based on Mr. Dill's report, the police had reason to believe a male inside of Room 228 was in possession of a gun, which he had used to threaten Mr. Dill. Also, inasmuch as the male staying in Room 228 had also purportedly

approached other patrons during the evening in an unusually aggressive and confrontational manner so as to alarm hotel employees, the police, based on their training and experience, had probable cause to suspect the male staying in Room 228 was holding or threatening other hotel patrons in his hotel room.

Additionally, we note that, given the fact the aforementioned incidents occurred during the evening, and it was approximately 6:00 a.m. when police received the dispatch and arrived on scene, there was a high probability that the male was still in Room 228. *See Runyan*, *supra*. Thus, we conclude the police had probable cause to suspect that an offense had been or was being committed, and the male staying in Room 228 was the perpetrator.

We note the suppression court concluded that since no person was being held against their will in Room 331 when the police arrived on the scene, there was no probable cause to conclude a crime had been or was being committed. *See* Suppression Court Order and Opinion, filed 3/4/20, at 5. However, this holding ignores Officer DeHoratius' undisputed testimony that Mr. Dill informed the officer that the crime against him occurred in the room where Appellee was located (Room 228), and Mr. Dill escaped and fled back to his Room (Room 331).

Moreover, we note the suppression court concluded there was no probable cause for the police to conclude a crime was committed or that the perpetrator was in Room 228 because "[i]t is not clear from the testimony whether or not Officer Devine knew the story of the phone charger situation

at the time he entered Room 228." Suppression Court Order and Opinion, filed 3/4/20, at 5.

Initially, we note that the suppression court's conclusion ignores Officer DeHortius' undisputed testimony that after Mr. Dill reported the story to him at the scene he immediately dispatched the information to his fellow officers, and Officer Devine would have received the dispatch. Furthermore, Officer Devine testified that he received dispatches from Officer DeHortius from which he concluded a crime was or had been committed in Room 228 prior to opening the door to Room 228. In any event, inasmuch as one officer had the information, it is imputed to the other officers, including Officer Devine. *See Commonwealth v. Young*, 644 Pa. 613, 177 A.3d 876 (2018) (holding that where there is evidence officers are working as a team, and one of them has probable cause, that knowledge can be imputed to the other officers, even without evidence that it was actually conveyed).

Next, the Commonwealth contends the suppression court erred in concluding exigent circumstances did not exist to justify the police making a warrantless entry into Room 228.

> This Court addressed the issue of police entry without a warrant and exigent circumstances in *Commonwealth v. Demshock*, 854 A.2d 553 (Pa.Super. 2004). We observed there that various factors need to be taken into account to assess the presence of exigent circumstances; for example: (1) the gravity of the offense; (2) whether the suspect is reasonably believed to be armed; (3) whether there is a clear showing of probable cause; (4) whether there is a strong reason to believe that the suspect is within the premises being entered; (5) whether there is a likelihood that the suspect will escape if not swiftly apprehended;

(6) whether the entry is peaceable; (7) the timing of the entry; (8) whether there is hot pursuit of a fleeing felon; (9) whether there is a likelihood that evidence will be destroyed if police take the time to obtain a warrant; and (10) whether there is a danger to police or other persons inside or outside of the dwelling to require immediate and swift action. ***Demshock***, 854 A.2d at 555–56.

***Dean***, 940 A.2d at 522.

"An inquiry to determine whether exigent circumstances exist involves a balancing of the individual's right to be free from unreasonable intrusions against the interest of society in investigating crime quickly and adequately." ***Commonwealth v. Caple***, 121 A.3d 511, 518 (Pa.Super. 2015) (quotation marks and quotations omitted). ***See Commonwealth v. Williams***, 602 A.2d 350, 354 (Pa.Super. 1992) ("Essentially, the exigent circumstances exception involves balancing the needs of law enforcement against individual liberties and/or rights. Some factors will outweigh others in a given case."). "It requires an examination of all of the surrounding circumstances in a particular case." ***Caple***, 121 A.3d at 518. "It is well established that police cannot rely upon exigent circumstances to justify a warrantless entry where the exigency derives from their own actions." ***Commonwealth v. Waddell***, 61 A.3d 198, 214 (Pa.Super. 2012).

Here, in balancing the relevant factors, we note the gravity of the offense was serious. For example, Appellee was charged with several felonies related to possession of the gun. ***See*** 18 Pa.C.S.A. § 6105(a.1)(1.1) (possession of firearm prohibited graded as first-degree felony); 6106(a)(1)

(firearms not to be carried without a license graded as third-degree felony). Furthermore, the police reasonably believed Appellee was in possession of a firearm in that Mr. Dill informed them Appellee had threatened him with a firearm while he was in Appellee's room. **See Dean**, **supra** (setting forth factors to consider in analyzing whether exigent circumstances existed).

Moreover, as indicated *supra*, under the totality of the circumstances, there was a clear showing of probable cause to believe a crime had been or was being committed. Additionally, given that the events with regard to Mr. Dill allegedly occurred during the evening, and it was approximately 6:00 a.m. when the police responded to the Summit Motor Inn, the police had a strong reason to believe that Appellee was in Room 228. **See id.** The hotel manager gave the police the key to Room 228, and there is no evidence the overnight occupant had checked out of the room.

Further, a prudent police officer would have believed that there was a likelihood the suspect within Room 228 would have escaped if not swiftly apprehended. **See id.** The police could not be sure when Appellee would attempt to leave his hotel room, and, additionally, the record reveals the Summit Motor Inn rooms had windows that opened to permit escape.

Moreover, the police entry of Room 228 was peaceable in that the police obtained a key to the room prior to entering so as to minimize the need for a violent or forced entry. Further, the police entered the room shortly after 6:00 a.m. **See cf. Commonwealth v. Berkheimer**, 57 A.3d 171, 179 (Pa.Super.

2012) (*en banc*) (stating that "the fact that an entry is made at night raises particular concern over its reasonableness[.]") (citation omitted)).

There was no evidence presented that the police were in hot pursuit of a fleeing felon or that the firearm would be destroyed if the police took the time to obtain a warrant.[7] *See Dean*, *supra*. However, inasmuch as the police had probable cause to believe that Appellee, who was reported to have been acting aggressively and confrontationally towards hotel patrons during the night, was inside of Room 228 with a firearm, we have no difficulty concluding there was danger to the police and the public if the police had delayed action until a search warrant was obtained. *See Commonwealth v. Hinkson*, 461 A.2d 616, 619 (1983) (holding exigent circumstances exist to enter house where police acted properly in order to protect the safety of the troopers and the public).

In balancing the factors set forth *supra*, we conclude the police's entry into Room 228 was justified by exigent circumstances.[8] *See Bostick*, 958 at 556 ("The law of search and seizure remains focused on the delicate balance of protecting the right of citizens to be free from unreasonable searches and

_____

[7] Although the police seized controlled substances and drug paraphernalia from Room 228, the Commonwealth presented no evidence that the police knew or suspected such items were in the room prior to the police's entry.

[8] We note there is no evidence the exigency in this case derived from the officers' own actions. *See Waddell*, *supra*.

seizures and protecting the safety of our citizens and police officers by allowing police to make limited intrusions on citizens while investigating crime.") (quotation marks and quotation omitted)).[9]  Accordingly, the suppression court erred in granting Appellee's motion to suppress the physical evidence seized from his hotel room (Room 228).[10]

For all of the foregoing reasons, we reverse the suppression court's March 4, 2020, order and remand for further proceedings.

Order Reversed; Case Remanded; Jurisdiction Relinquished.

*Judgment Entered.*

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/15/2020

_____

[9] There is no dispute that if the police had probable cause and exigent circumstances to enter Appellee's hotel room the police could seize the evidence lying in plain view on the bed. **See Commonwealth v. Luczki**, 212 A.3d 530, 547 (Pa.Super. 2019) (holding the plain view doctrine permits "the warrantless seizure of an object when: (1) an officer views the object from a lawful vantage point; (2) it is immediately apparent to him that the object is incriminating; and (3) the officer has a lawful right of access to the object").

[10] Moreover, assuming, *arguendo*, the "fruit of the poisonous tree" doctrine is applicable to pre-trial identifications made by victims, for the reasons stated *supra*, the suppression court erred in relying on the doctrine in suppressing the pre-trial identifications in this case.